The proposed notice forms are similar to those successfully used in numerous other class settlements. *See, e.g., In re Toys 'R' Us Antitrust Litig.,* 191 F.R.D. 347 (E.D.N.Y. 2000). The notices "fairly, accurately, and neutrally describe the claims and parties in the litigation, the terms of the proposed settlement and the identity of persons entitled to participate in it," and apprise affected consumers of their options with regard to the proposed settlement, thus fulfilling due process requirements. *Foe v. Cuomo,* 700 F. Supp. 107, 113 (E.D.N.Y. 1988), *aff'd,* 892 F.2d 196 (2d Cir. 1988), *cert. denied,* 498 U.S. 972 (1988). *See also Mullane v. Central Hanover Trust Co.,* 339 U.S. 306 (1950); *Weinberger v. Kendrick,* 698 F.2d 61, 70 (2d Cir. 1982).

For those whose names and addresses cannot be determined by reasonable efforts, notice by publication suffices under both Rule 23(c)(2) and under the due process clause. *Carlough v. Amchem Products, Inc.,* 158 F.R.D. 314, 325 (E.D. Pa. 1993) (*citing Mullane,* 339 U.S. at 317-18). Under the circumstances of this case, where End-Payor Plaintiffs, Plaintiff States and Defendants have limited and/or incomplete access to the names or addresses of End-Payors who purchased Remeron® during the Class Period, the law requires only notice by publication coupled with such mailed notice as is reasonably feasible. The Notice Plan here is consistent with notice plans used successfully in numerous other class actions and *parens patriae* settlements. *See, e.g., In re Toys 'R' Us Antitrust Litig.,* 191 F.R.D. 347 (E.D.N.Y. 2000). Therefore, this Court should approve the proposed Notice Plan, and order that Notice be mailed and published.

## VII.   CONDITIONAL CLASS CERTIFICATION FOR SETTLEMENT PURPOSES

### A.   Settlement Class Representation

The Settlement Class is jointly represented by the End-Payor Plaintiffs for all purposes and the Plaintiff States through their respective State Attorneys General, acting on behalf of the

consumers and State governmental entities within their respective States. The Attorneys General of the Plaintiff States Alabama, Alaska, American Samoa, Arizona, Arkansas, California, Colorado, Delaware, the District of Columbia, Florida, Guam, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Northern Mariana Islands, Ohio, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, U.S. Virgin Islands, Washington, West Virginia, Wisconsin, and Wyoming pled claims on behalf of injured consumers in a *parens patriae* (or equitable equivalent) capacity pursuant to statutory, equitable, and or common law authority.

These cases are also brought by the seven Plaintiff States of Connecticut, Georgia, Indiana, Massachusetts, Nebraska, Oklahoma, and South Carolina as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. In addition to the seven states seeking conditional settlement class certification as set forth above, the states of Iowa, North Dakota, Utah and Wisconsin seek conditional settlement class certification on behalf of consumers pursuant to Rule 23 as a supplement to any authority they possess to represent consumers under *parens patriae* or equitable authority.

The class representatives are:

> United Food and Commercial Workers Local 56 Health & Welfare Fund, and Board of Trustees of United Food and Commercial Workers Local 56 Health & Welfare Fund, a health benefit fund operated for the benefit of present and retired members of the union local and their families;

> Vista Healthplan, Inc., a health maintenance organization that provides comprehensive healthcare benefits to its members;

> Gayle Taylor, Dianne Mason, and Robert Kapella, all of whom are consumers who purchased Remeron® during the Class Period; and/or
>
> The Attorneys General of Connecticut, Georgia, Indiana, Iowa, Massachusetts, Nebraska, North Dakota, Oklahoma, South Carolina, and Wisconsin, on behalf of natural person members of the Settlement Class who reside in their respective states.

**B.**    **Conditional Class Certification For Settlement Purposes Only**

End-Payor Plaintiffs and the Plaintiff States, pursuant to the Settlement Agreement, seek certification of the following class constituted to be certified for settlement purposes only:

> All End Payors (including any assignees of such End Payors) who purchased and/or paid all or part of the purchase price of Mirtazapine Products in the United States during the period beginning June 15, 2001 through [the date of the Preliminary Approval Order]. Excluded from the Settlement Class are (i) Defendants and any of their subsidiaries and affiliates, (ii) all federal governmental entities, agencies and instrumentalities, and (iii) all wholesalers and retailers and all persons or entities that purchased Mirtazapine Products primarily for purposes of resale.

Under Rule 23 of the Federal Rules of Civil Procedure, the Court must engage in a two-step analysis in order to determine whether it should certify class action for settlement purposes. First, the Court must determine whether the End-Payor Plaintiffs and Plaintiff States have satisfied the prerequisites for maintaining a class action as set forth in Fed. R. Civ. P. 23(a). If the End-Payor Plaintiffs and Plaintiff States can satisfy these prerequisites, the Court must then determine whether the alternative requirements of Rule 23(b)(2) or 23(b)(3) are met. *See* Fed. R. Civ. P. 23(a) advisory committee's note. Applying this two-step analysis, the Court should certify the present action as a class action.

i.     **End-Payor Plaintiffs and Plaintiff States Have Satisfied All Prerequisites for Class Certification**

Rule 23(a) provides that class members may maintain a class action as representatives of a class if they show the court that:

(a)     the class members are so numerous that joinder of all members is impracticable;

(b)     the action addresses questions of law or fact common to the class;

(c)     the claims or defenses of the class representatives are typical of the claims or defenses of the class; and

(d)     the class representative parties will fairly and adequately protect the interests of the class.

End-Payor Plaintiffs and Plaintiff States have satisfied each of these prerequisites:

(a)     Courts will ordinarily discharge the prerequisite of *numerosity* if the class is so large that "joinder of all members is impracticable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Given the large numbers of Remeron® purchasers nationwide, the numerosity requirement is easily satisfied in this case.

To satisfy the numerosity requirement, "[t]he plaintiff need not precisely enumerate the potential size of the proposed class, nor is the plaintiff required to demonstrate that joinder would be impossible." *Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540, 543 (D.N.J. 1999). Moreover, "[i]t is proper for the court to accept common sense assumptions in order to support a finding of numerosity." *Cumberland Farms, Inc. v. Browning-Ferris Indus.*, 120 F.R.D. 642, 646 (E.D. Pa.

44

1988) (citation omitted); *accord In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996).

Here, the plaintiff class consists of End-Payors, including consumers, who paid all or part of the price of Remeron® in the United States during the class period. "There can be no serious question that joinder of all these parties, geographically dispersed throughout the United States, would be impracticable." *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244, 247 (S.D. Tex. 1978).

"[N]umbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the [numerosity] requirement." *Weiss v. York Hospital*, 745 F.2d 786, 808 n.35 (3d Cir. 1984). In this case, Plaintiffs aver that the class members number at least in the thousands. *See* Complaint ¶ 116.

The class thus easily fulfills the numerosity requirement. *Cf. Eisenberg v. Gagnon*, 766 F.2d 770, 785-86 (3d Cir. 1985) ("The allegation of more than 90 geographically dispersed plaintiffs met the numerosity requirement of Fed. R. Civ. P. 23(a)(1)."); *In re Antibiotic Antitrust Actions*, 333 F. Supp. 278, 280 (S.D.N.Y. 1971), *amended* 333 F. Supp. 291 (S.D.N.Y. 1971), *mandamus denied,* 449 F.2d 119 (2d Cir. 1971) (certifying consumer classes of indirect purchasers in an antitrust action, and holding that "[t]here is no question but that the members of the consumer class within each state are so numerous that joinder is impractical").

(b)     The threshold *commonality* inquiry is whether there are any questions of fact or law that are common to the class. Fed. R. Civ. P. 23(a)(2). "[C]ommonality does not require an identity of claims or facts among class members." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001). Rather, "[t]he commonality requirement

will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

"Because the [commonality] requirement may be satisfied by a single common issue, it is easily met . . . ." *Id.* Indeed, "[e]ven where individual facts and circumstances do become important to the resolution, class treatment is not precluded." *Id.* at 57. Thus, "the threshold of commonality is not high." *In re School Asbestos Litigation*, 789 F.2d 996, 1010 (3d Cir. 1986) (citation omitted).

Here, numerous common questions exist with respect to each member of the proposed class, and include, *inter alia*, the following:

(i)   Whether the relevant product market consists of Remeron® and its AB equivalents;

(ii)   Whether Defendants possessed, maintained and/or extended market power over the market for Remeron® and its generic equivalents;

(iii)   Whether Defendants have unlawfully monopolized or attempted to monopolize the market for Remeron® and its generic equivalents;

(iv)   Whether Defendants, through their monopolization and/or attempted monopolization, delayed the entry of low-cost generic mirtazapine, and thereby caused the prices of mirtazapine to be maintained at supracompetitive levels;

(v)   Whether Defendants committed fraud on the patent office;

(vi)   Whether Defendants wrongfully listed the '099 patent in the Orange Book;

(vii)   Whether Defendants unlawfully delayed the listing of the '099 patent in the Orange Book in order to further postpone

46

competition;

(viii) Whether Defendants' patent infringement lawsuits against horizontal competitors and potential competitors that had filed ANDA's for generic Remeron® constitute baseless litigation;

(ix) Whether the Class suffered actionable injury by reason of paying higher prices for mirtazapine;

(x) Whether Defendants were and continue to be unjustly enriched to the detriment of the Class, entitling the Class to disgorgement of all monies resulting from Defendants' unjust enrichment; and

(xi) The measure of damages for Plaintiffs' injury.

"Such issues have been found to satisfy the commonality requirement in other antitrust cases," *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 27 (D.D.C. 2001), and clearly satisfy the commonality requirement here. *Cf. In re Antibiotics Antitrust Actions*, 333 F. Supp. at 281 ("[C]ommon questions of fact and law were presented in the two aspects of the liability question, i.e., did the defendants violate the antitrust laws and did any violation injure the members of the class."); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 518 (E.D. Mich. 2003) ("In this case, the commonality criterion is satisfied because all of . . . Plaintiffs' claims derive from the same set of salient facts.").

Antitrust actions often present common questions of law and fact, and are, therefore, frequently certified as class actions. *See, e.g, Transamerican Refining Corp. v. Dravo Corp.,* 130 F.R.D. 70 (S.D. Tex. 1990) (antitrust price-fixing claims and common law fraud); *Cusick v. NV Nederlandsche Combinatie Voor Chemische Industrie,* 317 F. Supp. 1022, 1024 (E.D. Pa. 1970)

47

(consumer class action charging monopolization). However, *all* questions of fact and law need not be common to satisfy the rule. The "existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*., 150 F.3d at 1019.

(c)      The *typicality* requirement is easily satisfied here as all of the Settlement Class members' claims (and Organon's defenses thereto) arose at the same time and in the same market, and are based on the same theory of damages. *See Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 566-67 (D. Minn. 1968); *Antibiotic Antitrust Actions*, 333 F. Supp. at 280; *State of Illinois v. Bristol-Myers Co.*, 470 F.2d 1276 (D.C. Cir. 1972).

The Third Circuit has "set a low threshold for satisfying" the typicality requirement. *Newton*, 259 F.3d at 183; *see also Seidman v. American Mobile Sys.*, 157 F.R.D. 354, 360 (E.D. Pa. 1994) ("The threshold for establishing typicality is low.").

The Third Circuit repeatedly has held that "[i]f the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established . . . ." *Newton*, 259 F.3d at 183-84; *see also, e.g., Baby Neal*, 43 F.3d at 58 ("[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement.").

The typicality requirement "does not mandate that all putative class members share identical claims." *Newton*, 259 F.3d at 184; *see also Hassine v. Jeffes*, 846 F.2d 169, 176-77 (3d Cir. 1988). Plainly, "there is nothing in Rule 23(a)(3) which requires named plaintiffs to be clones of each other or clones of other class members." *In re Lorazepam & Clorazepate*, 202 F.R.D. at 27; *accord In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1036 (N.D. Miss. 1993).

48

Thus, the Third Circuit has held that "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Baby Neal*, 43 F.3d at 58; *see also Weiss*, 745 F.2d at 809 n36.

In this case, the End-Payor Plaintiffs have "alleged that they suffered harm as the result of the same company-wide conduct that injured the absentee class members." *In re Prudential Agent Actions*, 148 F.3d at 312. More specifically, the named Plaintiffs' claims and the class members' claims are identically predicated on Defendants' fraud on the patent office, Defendants' improper listing and late listing of the '099 patent in the Orange Book, and their filing of baseless patent infringement lawsuits against generic competitors.

Because the named Plaintiffs' claims and those of the class members arise from the same course of conduct, the named Plaintiffs' claims are typical of those of the class members. *Cf. Grasty v. Amalgamated Clothing and Textile Workers Union etc.*, 828 F.2d 123, 130 (3d Cir. 1987) ("[S]ince the various claims alleged appear to stem from a single course of conduct . . . we cannot conclude that the district court abused its discretion in holding that the typicality requirement was met.").

Furthermore, "[t]he claims pressed by the [class] representatives are identical to those which they press on behalf of the class generally." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3d Cir. 1977). In particular, the representative Plaintiffs and the absentee class members bring claims for violations of federal and state antitrust laws, and for unjust enrichment. Thus, "[t]here are no differences as to the type of relief sought or the theories of liability upon which plaintiffs will proceed." *Corrugated Container*, 80 F.R.D. at 248.

As this court held in *Stephenson v. Bell Atlantic Corp.*, 177 F.R.D. 279 (D.N.J. 1997)

49

(Simandle, J.):

> In order to prevail on the merits of [their] claims, the named plaintiffs will have to prove the same major elements that the absent members of the class would have to prove: [defendant's] monopoly power in the relevant market, its willful maintenance of that power, and a resulting injury. Thus, the named plaintiffs' claims are typical of the putative class . . . .

*Id.* at 285-86.

In sum, "[h]ere, the claims of the representative plaintiffs arise from the same course of conduct that gave rise to the claims of the other class members and are based on the same general legal theories." *Warfarin*, 212 F.R.D. at 250. Accordingly, Plaintiffs plainly meet the typicality requirement.

(d)     The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Third Circuit has held that "adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 923 (3d Cir. 1992); *accord Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975).

As to the first factor, End-Payor Plaintiffs' counsel have successfully prosecuted numerous antitrust class actions. Moreover, these counsel stand "ready, willing and able to devote the resources necessary to litigate this case vigorously," *NASDAQ*, 169 F.R.D. at 515, and indeed have already invested substantial resources in the prosecution of this litigation.[11]

---

[11]  Many courts have commented favorably on the experience and qualifications of the counsel representing the End-Payor Plaintiffs. *See* n. 7, *supra*.

As to the second factor, the named Plaintiffs have no interests that are antagonistic to those of the absent class members.  By pursuing this litigation, each representative Plaintiff will necessarily advance the common interests of all other class members.

The central issues in this case – whether Defendants committed fraud on the patent office; whether Defendants improperly listed and late listed the '099 patent in the Orange Book; whether Defendants filed baseless patent infringement lawsuits; and whether Defendants' conduct violated federal and state antitrust laws or the common law of unjust enrichment – are common to the claims of the named Plaintiffs and the absent class members.  In proving these common issues, the class representatives further the absent class members' claims no less than their own. *Cf. In re Cardizem CD Antitrust Litig.*, 218 F.R.D. at 518 ("Each Class member . . . has a common interest in establishing that he, she, or it was financially injured by Defendants' conduct and in an aggregate damages computation."); *Warfarin*, 212 F.R.D. at 251 ("The named plaintiffs share a strong interest in establishing liability of defendant, seeking the same type of damages (compensation for overpayment) for the same type of injury (overpayment for warfarin sodium).").

Finally, the adequacy of representation by the Attorneys General of the Plaintiff States is crystal clear.  Indeed, courts have concluded that "it is difficult to imagine a better representative of the retail consumers within a state than the state's attorney general." *Antibiotic Antitrust Actions,* 333 F.Supp. at 280; *see also, F.T.C. v. Mylan Lab*, 205 F.R.D. 369, 387, (D.D.C. 2002) (Plaintiff States "have evidenced a genuine interest in this litigation, and are qualified and experienced.").

States, acting through their attorneys general, have frequently been held to be the "best representatives of the consumers residing within their jurisdictions." *In re Ampicillin Antitrust Litig.*, 55 F.R.D. 269, 274 (D.D.C. 1972); *see also West Virginia v. Chas Pfizer & Co.*, 440 F.2d

1079, 1089-91 (2nd Cir. 1971), *cert denied, Cotler Drugs, Inc. v. Chas Pfizer,* 404 U.S. 871 (1971)
(representation by state protects drug consumer class members' interests under Rule 23). Indeed,
Congress itself has found that "the State's attorney general is the best representative conceivable for
the State's consumers, as the courts have repeatedly recognized." 122 Cong. Rec. 30, 868, at 30, 879
(1976).

### ii.     A Class Action Will Avoid The Risk Of Inconsistent Adjudications

Once the requirements of Rule 23(a) are met, Rule 23(b)(2) permits the maintenance of a
class action if "the party opposing the class has acted or refused to act on grounds generally
applicable to the class, thereby making appropriate final injunctive relief or corresponding
declaratory relief with respect to the class as a whole."

To meet the requirement of Rule 23(b)(2), "the putative class must demonstrate that the
interests of the class members are so like those of the individual representatives that injustice will
not result from their being bound by such judgment in the subsequent application of principles of
*res judicata*." *Hassine*, 846 F.2d at 179. "When a suit seeks to define the relationship between the
defendant(s) and the world at large, . . . (b)(2) certification is appropriate." *Weiss*, 745 F.2d at 811;
*accord Baby Neal*, 43 F.3d at 59.

In addition to seeking damages, Plaintiffs in this case have also sought declaratory and
injunctive relief. *See* Complaint ¶¶ 133-34. In cases such as this, "[c]ourts have held that a (b)(2)
class is appropriate . . . where both final injunctive and monetary relief are granted." *Wetzel*, 508
F.2d at 251.

Here, by fraudulently obtaining the '099 patent, improperly listing the '099 patent in the

Orange Book, intentionally delaying that listing in violation of the applicable regulation, filing baseless patent infringement suits against manufacturers of generic mirtazapine, foreclosing generic competition, and charging supracompetitive prices for Remeron®, Defendants have allegedly acted on grounds generally applicable to the class as a whole, making declaratory and injunctive relief appropriate. Indeed, Defendants "charged <u>all</u> of the class members the same, allegedly monopolistic prices and thus injured all of the class members in the same way." *Davis v. Southern Bell Tel. Co.*, 1993 U.S. Dist. LEXIS 20033, *18 (S.D. Fla. Dec. 23, 1993).

"Because this suit challenges conduct generally applicable to the class and because the court can enter appropriate declaratory and injunctive relief, this action patently satisfies the (b)(2) standard." *Baby Neal*, 43 F.3d at 64-65.

Indeed, numerous federal courts have certified plaintiff classes under Rule 23(b)(2) in cases involving antitrust claims. *See Davis*, 1993 U.S. Dist. LEXIS 20033 at *18; *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68, 88 (E.D.N.Y 2000); *NASDAQ*, 169 F.R.D. at 515; *Catfish*, 826 F. Supp. at 1046.

### iii.   Questions Of Law And Fact Common To The Class Predominate

Alternatively, once the requirements of Rule 23(a) are met, Rule 23(b)(3) permits the maintenance of a class action if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." As explained below, this case easily fulfills both the predominance and superiority requirements of Rule 23(b)(3).

53

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623.

"The presence of individual questions . . . does not mean that the common questions of law and fact do not predominate . . . ." *Eisenberg*, 766 F.2d at 786; *see also In re Prudential Agent Actions*, 148 F.3d at 312; *Hoxworth*, 980 F.2d at 924. That is, "[t]hat common issues must be shown to 'predominate' does not mean that individual issues need be non-existent." *Cannon*, 184 F.R.D. at 545 (citation omitted). Indeed, "[e]ven a few common issues will satisfy the predominance inquiry where the resolution of these issues will greatly advance the litigation." *Stephenson*, 177 F.R.D. at 286.

As the Supreme Court has observed, "[p]redominance is a test readily met in certain cases alleging . . . violations of antitrust laws." *Amchem*, 521 U.S. at 625. In particular, "[a]ntitrust actions involving common questions of liability for monopolization . . . have frequently been held to predominate for the preliminary stage of class certification." *In re Lorazepam & Clorazepate*, 202 F.R.D. at 29. Questions of law and fact concerning the existence of that monopolization and attempted monopolization clearly predominate over factual or legal issues of concern to individual class members, as is usually the case where an overarching conspiracy to fix prices is charged. *See* JULIAN O. VON KALINOWSKI, 6 ANTITRUST LAWS AND TRADE REGULATION 108.03[4] (1991).

In this case, common questions of law and fact clearly predominate. In particular, all claims of all class members arise from the same allegations, namely Defendants' fraud on the patent office, Defendants' improper listing and late listing of the '099 patent in the Orange Book, their filing of baseless patent infringement lawsuits against generic competitors, the foreclosure of generic competition caused by this conduct, and the supracompetitive prices resulting from Defendants'

monopoly power.

"As is true in many antitrust cases, the alleged violations of the antitrust laws at issue here respecting . . . monopolization relate solely to Defendants' conduct, and as such proof for these issues will not vary among class members." *In re Lorazepam & Clorazepate*, 202 F.R.D. at 29 (internal quotation marks and citation omitted).

As the Third Circuit held in *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002), *cert. denied*, 123 S.Ct. 1786 (2003), in words equally applicable to this case, "common issues . . . predominate here because the inquiry necessarily focuses on defendants' conduct, that is, what defendants did rather than what plaintiffs did." *Id.* at 162 (citation omitted). Here, as in pharmaceutical cases in which a class has been certified for all purposes, "generalized evidence exists for attempting to prove antitrust impact and . . . the analyses involved will be conducted most efficiently on a class-wide basis and involve common issues of proof that predominate." *In re Lorazepam & Clorazepate*, 202 F.R.D. at 30. *See also, e.g., In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 668-71 (E.D. Mich. 2000); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 344-47 (E.D. Mich. 2001).

In sum, "[t]he common questions of law, the elements of the monopolization claim fully enumerated, . . . dwarf, rather than merely predominate over, any individual questions." *Sollenbarger v. Mountain States Tel. and Tel. Co.*, 121 F.R.D. 417, 427 (D.N.M. 1988); *see also Davis*, 1993 U.S. Dist. LEXIS 20033 at *21 ("[T]he issues of antitrust violation, injury, and damages all turn on class-wide proof."). Accordingly, this case easily satisfies the predominance requirement of Rule 23(b).

### iv.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of this Controversy

Finally, Rule 23(b)(3) requires the court to find "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). As stated in the MANUAL FOR COMPLEX LITIGATION, FOURTH, to analyze whether a class action is superior, "the judge must determine whether there are individual issues of fact and how they relate to the common issues and then examine how the class action process compares to available alternatives . . . ." *Id.* at 21.142.

Moreover, "[i]n the case of consumers, the class members here have little interest in 'individually controlling the prosecution or defense of separate actions,' Fed. R. Civ. P. 23(b)(3)(A), because each consumer has a very small claim in relation to the cost of prosecuting a lawsuit." *Warfarin*, 212 F.R.D. at 251. Indeed, "where it is not economically feasible to obtain relief . . . aggrieved persons may be without any effective redress unless they employ the class action device." *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339, 63 L. Ed. 2d 427, 100 S. Ct. 1166 (1980); *NASDAQ*, 169 F.R.D. at 527.

"Even if a significant percentage of [class members] did bring suit, pursuing each claim in a separate action requiring weeks or months of trial time, the burden to the courts would be enormous, the needless duplication of effort would be extremely expensive for all parties, and the possibility of conflicting outcomes is readily apparent." *Corrugated Container*, 80 F.R.D. at 252.

"Obviously, individual actions designed to prove identical elements would completely destroy any notions of judicial economy." *Catfish*, 826 F. Supp. at 1034. "In view of the large size of the potential class, requiring each of the members of the putative class to seek relief individually

for their common grievances would be extremely wasteful and inefficient." *Jennings Oil Co. v. Mobil Oil Corp.*, 80 F.R.D. 124, 131 (S.D.N.Y. 1978).

In contrast to the inefficiency of duplicative individual lawsuits, "[t]he efficacy of resolving all plaintiffs' claims in a single proceeding is beyond discussion." *Sollenbarger*, 121 F.R.D. at 436. The class action mechanism will "conserve judicial resources and eliminate the risk of inconsistent adjudications on the issues common to the class." *Davis*, 1993 U.S. Dist LEXIS 20033 at *29.

Judicial economy as well as fairness to Defendants makes the litigation of such claims in one action far more desirable than numerous separate actions litigating the same issues. Because the End-Payor Plaintiffs and Plaintiff States have satisfied all of the requirements under Fed. R. Civ. P. 23(a) and the requirements of Fed. R. Civ. P. 23(b)(2) and (b)(3), this Court should conditionally certify the proposed class for purposes of this settlement, and direct that the Notice Plan be implemented.

## VIII. CONCLUSION

For the foregoing reasons, End-Payor Plaintiffs and the Plaintiff States respectfully request that the Court grant preliminary approval of the settlement, conditionally certify the requested class for settlement purposes, and approve the Notice Plan, so that notice can be given to the Settlement Class of a Fairness Hearing with respect to the proposed Settlement.

A copy of the Preliminary Approval Order, identical to Exhibit B to the Settlement

Agreement, has been submitted as Exhibit B hereto.

Dated this $\widehat{\mathcal{U}}$ day of October, 2004.

Respectfully submitted,

**TRUJILLO RODRIGUEZ & RICHARDS, LLC**

By: _____
Lisa J. Rodriguez
8 Kings Highway West
Haddonfield, NJ 08033
(856) 795-9002

Joseph H. Meltzer, Esq.
Schiffrin & Barroway, L.L.P.
Three Bala Plaza East, Suite 400
Bala Cynwyd, Pennsylvania 19004

Arthur M. Kaplan, Esq.
Allen D. Black, Esq.
Fine Kaplan & Black, RPC
1845 Walnut Street, Suite 2300
Philadelphia, Pennsylvania 19103
**End-Payor Plaintiffs' Co-Lead Counsel**

Patricia A. Conners, Esq.
Director, Antitrust Division
Elizabeth G. Arthur, Esq.
Assistant Attorney General
Office of the Attorney General
State of Florida
The Capitol, Plaza Level One
Tallahassee, Florida 32399-1050

Kim Van Winkle, Esq.
Assistant Attorney General
Antitrust and Civil Medicaid Fraud Division
Office of the Attorney General
State of Texas
P.O. Box 12548
Austin, Texas 78711-2548
**State Liaison Counsel**

58

# EXHIBIT A

# REMERON NOTICE PLAN

# Executive Summary

The purpose of this document is to recommend a nationwide Notice Plan (including Guam, Puerto Rico and U.S. Virgin Islands) to publicize the Remeron Class Action Settlement.

The Notice Plan will advise:

    1)  Consumers and Third-Party Payors ("TPPs") Class members (collectively, the "End-Payor Class") of the toll-free telephone number, Internet website and mailing address where they can obtain copies of the Notice of Class Action, Proposed Settlement and Fairness Hearing and Request for Future Notices and A Claim Form (collectively, "Settlement Notice Packet") (the media and "earned" media components); and

    2)  Potential Class members of their rights under the Settlement and how to receive future notices and a Claim Form (the direct mailing and Internet components).

Our recommended Notice Plan includes publishing a Summary Notice (attached hereto as **Exhibit 1**) in Sunday newspaper supplements, a business-to-business magazine and general market newspapers.  All media will target potential End-Payor Class members, persons or entities who purchased Remeron in the United States and its territories, during the period May 1, 2001 through the date of the Court's Preliminary Approval Order for consumption by themselves, their families or their members, employees, insureds, participants or beneficiaries.

In addition to Summary Notice publication, CCS will mail the Settlement Notice Packet to all potential TPP Class members included in CCS' proprietary TPP Mailing Database (defined on page 8) to inform potential Class members of their rights and how they may participate in the class action.

To enhance the reach and frequency of the media, CCS will solicit assistance from:

    1)  chain pharmacies in the form of a direct mail campaign "through" the chain pharmacies;
    2)  psychiatrists in notifying patients;
    3)  TPPs to notify customer/members/employees; and
    4)  free or "earned" media, that includes contacting mental health organizations and consumer groups, thereby identifying potential Class members.

Implementing this Notice Plan (assuming significant cooperation from the groups identified in 1 – 4 above), <u>we estimate that the reach achieved will be nearly 90 percent and frequency realized may be as much as 2.5 times</u>.

The objective of this Notice Plan is to notify the largest number of End-Payor Class members practicable in the U.S. and its territories, and provide them with sufficient exposure opportunities to see and understand the Settlement Notice.

# Methodology and Technical Approach of the Notice Plan

## Consumer Target Audience

To define the audience of people who have used Remeron and understand their media habits, several research studies were examined, in addition to the 2003 Media Mark Research, Inc. ("MRI"), to establish the *reach\** of the media program and the *frequency\*\** of exposure to the media vehicles.  They include:

- Scarborough Research 2002
- The National Mental Health Association
- The National Foundation for Depressive Illness

*\*Reach* is the estimated percentage of a target audience reached through a specific media vehicle or combination of media vehicles.
*\*\*Frequency* is the estimated average number of times an audience is exposed to an advertising vehicle carrying the message.

The findings indicate the following as key demographics of persons who use prescription remedies for general depression.

- 27.4% male                          72.6% female

- The Median Age of Adults who use prescription medication for depression is 46.4 years. The age of persons using prescription drugs for depression breaks down as follows, with adults age 45-54 having the highest percentage.

| Age Group | Percentage |
|-----------|-----------|
| Age 65+ | 13.78% |
| Age 55-64 | 14.00% |
| Age 45-54 | 26.02% |
| Age 35-44 | 22.86% |
| Age 25-34 | 14.31% |
| Age 18-24 | 9.02% |

- The Median Household Income of people taking prescription medication for depression is $43,173.

- Persons who are not working or retired make up 46% of the target audience. This indicates that some people may be of a working age, but are unable to hold a full-time or part-time position due to their depression diagnoses.

| Working Classification | Percentage |
|-----------------------|-----------|
| Working full-time/part-time | 53.9% |
| Not working/retired | 46.1% |

- They have a higher than average divorced/widowed/separated rate than the average US person.

| Marital Status | Percentage | Index to US Average |
|----------------|-----------|---------------------|
| Married | 55.8% | 98 |
| Single | 19.6% | 81 |
| Divorced/Widowed/Separated | 24.5% | 130 |

- People taking prescription medication for depression are more likely to be living in the Southeast or Pacific regions of the country.

| Region of Country | Percentage |
|---|---|
| New England Region | 5.6% |
| Mid-Atlantic Region | 12.9% |
| East Central Region | 14.6% |
| West Central Region | 13.9% |
| Southeast Region | 24.7% |
| Southwest Region | 11.0% |
| Pacific Region | 17.4% |

- This target audience is avid readers of magazine and viewers of television. This corresponds with the high unemployment numbers.

Persons who are taking prescription medication for depression are primarily female, age 45 and older, most likely retired or not able to hold a job due to their medical condition, with an annual household income of approximately $43,000. They are avid readers of magazines and viewers of television with ample time to spend on leisure activities. Please refer to **Exhibit 2 (demographic profile)** for more details.

# Published Notice

## Consumer Vehicle Selection

Syndicated data, audited data and proprietary research from the National Mental Health Association and the National Foundation for Depressive Illness were reviewed to identify the media vehicles that will most effectively deliver the message to potential Class members in the U.S. and its territories (specifically, Guam, U.S. Virgin Islands and Puerto Rico).

Based on this research, a recommended Summary Notice campaign has been formulated. The plan is a combination of national Sunday Supplements and *USA Today* to reach Consumers plus an insertion in *National Underwriter* to reach Third-Party Payors.

The recommended campaign will provide:

- The opportunity to deliver a clear national message to the End-Payor Class members throughout the United States and its territories.

- Two opportunities for End-Payor Class members to see the message in either a Sunday Supplement or *USA Today*.

- Printed versions of the Summary Notice will provide readers with a written notification of how to respond by referring back to the Summary Notice. They may also pass the Summary Notice along to others without any misinterpretation.

- The printed toll-free number, website address, and Settlement Administrator mailing address will provide a means for End-Payor Class members to obtain information about the Settlement at no cost to them.

- The Notice Plan will commence within 90 days of the Court's Preliminary Approval Order. The Notice Period will be 45 days. Settlement Class members will have 45 days from the date of notice to request exclusion from the Settlement Class or to submit any objections to the final approval of the Settlement Agreement.

- Depending on the publication, several ad sizes will be used. It is recommended that the Notice size be prominent with the assistance of a large, bold headline and limited text.

- Targeted, pinpoint demographic and geographic coverage eliminates futile exposure of the Notice.

## National Targeted Publications

The national publications for this Notice Plan include the publications outlined below. These publications do not provide any coverage of the U.S. territories as their circulation is all within the 50 U.S. states.

| Publication | Circulation | Publication Frequency | Ad Size | Cost |
|-------------|-------------|----------------------|---------|------|
| Parade | 35,700,000 | Weekly | 2/5 page | $242,496 |
| USA Weekend | 23,700,000 | Weekly | 2/5 page | $179,733 |
| USA Today | 2,162,000 | Mon-Fri | 1/4 page | $28,440 |

### National Consumer Publications

The recommendation of the consumer magazines selected for this campaign is based upon the syndicated research measured by MRI. Below are the top 10 consumer magazines ranked by their total audience numbers to reach persons age 55 and older in the U.S. Please refer to **Exhibit 3** for the complete list of measured magazines.

| Magazine | Audience | % Coverage | % Composition |
|----------|----------|-----------|---------------|
| Metro-Puck Comics | 26,289,000 | 48.0% | 30.3% |
| Parade Sunday Supplement | 24,415,000 | 44.6% | 30.7% |
| Reader's Digest | 16,758,000 | 30.6% | 37.2% |
| USA Weekend Sunday Supplement | 14,785,000 | 27.0% | 33.0% |
| Modern Maturity | 11,780,000 | 21.5% | 77.8% |
| Better Homes & Gardens | 9,718,000 | 17.7% | 29.0% |
| National Geographic | 8,195,000 | 15.0% | 27.5% |
| Good Housekeeping | 7,836,000 | 14.3% | 32.8% |
| TV Guide | 7,528,000 | 13.7% | 22.5% |
| Family Circle | 7,287,000 | 13.3% | 33.6% |

### Newspapers

One national newspaper, *USA Today*, with a national daily circulation of 2,162,000, is recommended to provide national weekday coverage of the Notice campaign. This newspaper has a high, loyal readership of consumers and business people on a daily basis.

## U.S. Territory Publications

*USA Today* and the Sunday supplements do not provide adequate media coverage of the U.S. territories, Puerto Rico, Guam and the Virgin Islands. Therefore, the newspapers listed below, with the largest circulation in each territory, are recommended to provide sufficient coverage of these countries.

| U.S. Territory Newspaper | Circulation | Frequency | Ad Size | Cost |
|---|---|---|---|---|
| El Nuevo Dia | 204,375 | Daily | 1/4 page | $ 2,463 |
| Pacific Daily News | 30,000 | Daily | 1/4 page | $961 |
| Virgin Island Daily News | 17,000 | Daily | 1/4 page | $691 |

There may be a nominal charge for the Spanish translation in *El Nuevo Dia*.

## Media Vehicles Reviewed But Not Recommended

Other advertising vehicles were reviewed for this campaign such as broadcast and cable television, but were dismissed as being too expensive and inefficient to reach the senior audience. As well, extending the reach and frequency through other paid consumer magazines with a significant senior subscriber base, such as *Modern Maturity* and *Reader's Digest,* are also not recommended, though they are efficient and effective in reaching the target.

"Senior newspapers" were also given significant consideration as a cost effective media vehicle to reach this target audience. With the editorial content of these publications focused on local issues that impact seniors, these newspapers are vital communication tools for the senior community. However, at a cost of $137, 500 to provide complementary coverage in 20-targeted geographic areas, it is not recommended to include them at this time.

The factors reviewed to determine which publications would be recommended include:

- Reach of target audience
- Cost efficiency to reach target audience
- Editorial environment
- Syndicated and audited research sources such as MRI and Scarborough, which provide audience coverage and composition analysis

The publications not recommended failed to deliver the audience as effectively and efficiently as the recommended publications. Additionally, the editorial in some of the reviewed publications may have been incompatible with the target audience. The chart below shows just a few of the publications reviewed but not recommended for a cost effective nationwide media plan. Please refer to **Exhibit 3** for the research studies that show additional detail on publications reviewed.

| | | | | |
|---|---|---|---|---|
| Modern Maturity | VFW Magazine | American Legion | Reader's Digest | Sat. Evening Post |
| Senior Newspapers | Natural History | Southern Living | Prevention | Family Circle |
| Catholic Digest | True Story | Metro Comics | Better Homes & Gardens | Ladies Home Journal |
| National Geographic | TV Guide | Woman's Day | People | Time |
| Newsweek | Prevention | National Enquirer | Martha Stewart Living | Country Living |

## Consumer Publication Plan Delivery

This Notice Plan's consumer published media schedule is based upon tools and techniques specifically designed for legal notification media planning, accepted advertising industry media audience analysis, as well as 20+ years of consumer print, newspaper, television and trade publication advertising experience. Therefore, the audience delivery of this consumer published media plan has been developed using industry standard computer software along with the judgment of 20 years experience in the development of consumer media plans.

Based on the Metheringham Formula utilized by MRI for the computation of reach and frequency analysis, the Consumer Publication Notice program outlined above provides the following estimated reach and frequency exposure to the target audience.

| Audience Delivery (media only) | |
|---|---|
| Reach A55+ | 56.7% |
| Frequency A55+ | 1.1 times |
| Gross Impressions A55+ | 45,151,000 |

Reach is the estimated percentage of a target audience reached through a specific combination of media vehicles. Frequency is the estimated average number of times an audience has the potential to be exposed to advertising vehicles carrying the message. Gross impressions are the total number of times the target has the opportunity to be exposed to the advertising message. This number includes duplication as people may see the message in more than one media vehicle.

Please note the reach and frequency analysis set forth above uses the same audience measurement data employed by 100% of the top 100 U.S. advertising agencies. They uniformly rely on data from these same sources in making decisions on how to spend billions of client advertising dollars.

## National Trade Publications/Third Party Payors

Since a direct mailing will take place to TPPs, Pharmacy Benefit Managers ("PBMs"), self-insured plans, record keepers, etc., described more fully below, we recommend using the following trade publication to supplement the mailing to TPPs:

| Trade Publications | Circulation | Frequency | Ad Size | Cost |
|---|---|---|---|---|
| National Underwriter | 48,522 | Weekly | 1/2 page | $ 2,579 |

The recommended TPP publication provides the most targeted access to managers and executives in the insurance industry. *National Underwriter* is the leading news weekly in the insurance industry and we continue to support using this publication for the publishing of Legal Notices. *National Underwriter* has circulation that reaches readers across the U.S. and its territories.

## Creative Units

As outlined in the chart below, the most affordable, yet prominent creative units are recommended for each publication.

| Publication | Creative Unit |
|---|---|
| *Parade* | 2/5 page B&W |
| *USA Weekend* | 2/5 page B&W |
| *USA Today* | 1/4 page B&W |
| U.S. Territory Newspapers | 1/4 page B&W |
| *National Underwriter* | 1/2 page B&W |

## Notice Scheduling

The Published Notice Plan is intended to identify Class members and provide them with the best practicable opportunity to see, read and understand the Summary Notice allowing them to respond easily. In determining the number of Summary Notices to schedule in each publication, several factors have been considered:

| Frequency Factor | Media Recommendation | Result for this Notice Program |
|---|---|---|
| Sunday Supplement Creative Unit | The Notice will be 2/5 page black & white | Moderate frequency required |
| Newspaper Creative Unit | The Notice will be 1/4 page black & white | Moderate frequency required |
| Consumer Style Copy | Published Notice written in consumer-style copy; easier to catch the eye of the consumers and for them to comprehend the message. | Less frequency required |
| Legal Style Copy | Published Notice written in legal-style copy; small type written in legal format; difficult to attract the Consumer and challenging for them to understand. | High frequency required |
| Message Complexity | The message will alert the target audience to read the Notice. There may be a fair amount of necessary disclosure information. | High frequency required |
| Importance to the Reader | The topic of the message will draw attention from Consumer Class members as it may have a financial gain for them. | Less frequency required |
| Specific vs. general message | The message is very specific unlike brand advertising that is designed to build image over a longer period of time. | Less frequency required |
| Message clutter | There will be no conflicting or competitive official notices on this topic, yet it is important that the message not be confused with any other information in the media about this product. | Moderate frequency required |
| Advertising environment clutter | The recommended Sunday supplements are not heavily cluttered with advertising, and the target audience spends a longer than average time reading; Newspapers are a very cluttered environment and messages can be easily lost if the ad size is small, includes small type and there is no large attention-getting headline. | Moderate frequency required |

| Frequency Factor | Media Recommendation | Result for this Notice Program |
|---|---|---|
| Editorial environment | The print media selected are valued and trusted sources of information to this target audience and allow the message to be presented clearly enhancing readership and understanding. | Less frequency required |
| Pre-existing knowledge of topic | The target audience is avid pursuers of information as it pertains to their health, absorbing information that impacts their physical well-being. | Less frequency required |

Based on the factors considered above, each publication will receive the most effective number of insertions to enable the target audience to have the opportunity to be exposed to the Summary Notice message. The Consumer Publication Budget Summary includes the number of Notices to be published in each media vehicle.

Placement of each Summary Notice will be discussed and negotiated with each publication. Every effort will be made to receive excellent positioning within each publication. In *USA Today,* the Notice will be positioned within the main news section of the paper to ensure the broadest reach possible. It will not be placed in the legal notice section. In the Sunday supplements, it will run opposite the editorial ensuring a higher readership. The Notice size and design will make it visible, noticeable and understandable to ensure the broadest readership.

## Publication Budget Summary

| Consumer Published Notice Plan | | | |
|---|---|---|---|
| Publications | Notice Size | # Ads | Cost |
| *Parade* | 2/5 page | 1 | $242,496 |
| *USA Weekend* | 2/5 page | 1 | $179,733 |
| *USA Today* | 1/4 page | 1 | 28,440 |
| Sub-Total Cost | | | $ 450,669 |
| Consumer Plan Delivery (MRI Computer Generated) | | 56.7% reach 45,151,000 gross impressions | |

| Third Party Payor Published Notice Plan | | | |
|---|---|---|---|
| Publication | Notice Size | # Ads | Cost |
| National Underwriter | 1/2 page | 1 | 2,579 |

| U.S. Territory Consumer Published Notice Plan | | | |
|---|---|---|---|
| Publications | Notice Size | # Ads | Cost |
| El Nuevo Dia | 1/4 page | 1 | 2,463 |
| Pacific Daily News | 1/4 page | 1 | 961 |
| Virgin Island Daily News | 1/4 page | 1 | 691 |
| Sub-Total Cost | | | $4,115 |

| **Total Cost | | | $ 457,363 |
|---|---|---|---|

**All rates are 2004 estimates   There is an expected increase for 2005 rates of approximately 10%

# Mailed Notice

## Direct Notice to TPP

Direct mail notice will consist of mailing the Settlement Notice Packet to inform potential Class members of their rights and how they may participate in the class action. This direct mail Settlement Notice Packet will be sent to all potential TPP Class members included in CCS' proprietary TPP Mailing Database (defined below).

CCS maintains a database of approximately 13,500 TPPs, (e.g., insurance companies, healthcare and welfare funds, self-insureds, etc.) and recordkeepers (e.g., third-party administrators and pharmacy benefit managers) to which we can directly mail Notices. This database, which is linked to our proprietary system, **ISIS (Integrated Settlement Information Software),** was compiled from researching and accessing records of various databases and listings of affiliations, group insurance plans, self-insureds, ERISA funds, pharmacy benefit manager listings, etc., and has been used for noticing purposes in similar litigations. The TPP database is continually updated with changes of address and undeliverable notifications, as well as augmented with new TPP Class members identified in other settlements.

The TPP database has successfully been used in the **Taxol, BuSpar, Cardizem, Hytrin, Mylan, Augmentin** and **Coumadin Settlements.** The CCS proprietary TPP Database is recommended for noticing potential TPP Class members by directly mailing to these TPPs and recordkeeping entities.

## Direct Notice to Consumer

All callers to the toll-free information line can obtain information and request the Settlement Notice Packet. The toll-free number will appear prominently in the published forms of the Notice.

## Direct Mail "Through" Chain Pharmacies

Potential Class members will be identified with the assistance of chain pharmacies and the State Attorneys General. Participating pharmacies will mail a Settlement Notice Packet to Potential Class members. CCS will offer participating pharmacies reimbursement of out-of-pocket expenses, if any. Upon receipt of an executed form, a Claim Form will be mailed to the potential Class member. We recommend this program as an additional opportunity to reach those Class members who may: miss seeing the Summary Notice in their newspaper's Sunday supplement or *USA Today.* We further recommend this program as an additional vehicle to reach those Class members who *did* see the Summary Notice in either the Sunday supplement or USA Today, to increase the frequency to these Class members.

## Direct Mail Notice "Through" Entities in the CCS TPP Mailing Database

CCS will include a cover letter in the Settlement Notice Packet that is to be mailed to the entities in the TPP Mailing Database. This cover letter will solicit the assistance of these entities to directly notify their members/customers of this Settlement. Many of these entities have websites for their members to access information, have periodic mailings of "newsletters", and have other "contact" with their members/customers.

## Direct Mail "Through" Psychiatrists

There are approximately 23,000 psychiatrists in the United States. Remeron is a "second stage" antidepressant drug typically prescribed by psychiatrists and family doctors. Since Psychiatrists prescribe nearly 50% of the Remeron prescriptions, CCS recommends that a Settlement Notice Packet be mailed to this group, informing them of the Settlement and soliciting their assistance in notifying their patients (potential Class members) by offering to supply additional Settlement Notice Packets and reimbursement of out-of-pocket expenses, if any.

# News Media

CCS will implement a campaign to expand notice through free or "earned" media which will include contacting Consumer groups, such as AARP; Mental Health groups such as the National Alliance for the Mentally Ill, National Federation for Depressive Illness, National Mental Health Association, National Community Pharmacists Association, to name a few, and issuing a press release over BusinessWire.

# Toll-Free Telephone Number

Certainly, an integral part of the Dissemination and Noticing process will be the Settlement Administrator's ability to respond timely to inquiries from Class members and requests for Settlement Notice Packets.

CCS will provide a toll free number to respond to Class members' inquiries. We plan to provide a three-tier telephone process, which allows the caller to:

    (a) hear a recorded message addressing "frequently asked questions";

    (b) if after listening to the recorded message, a Class member believes he or she is an eligible Class member and wants to request a Settlement Notice, we will capture caller information through an automated address verification system, Targus*** (defined below), and/or

    (c) if the caller otherwise wishes, be transferred directly to a "live" operator to leave their name and address, or have other questions addressed.

***The Targus system prompts callers for their 10-digit telephone number, which is then retrieved from a real-time database containing telephone numbers and addresses from various national public and private listings. The address is provided back to the caller and if it is not correct or in the database, or the caller wishes not to use this system; the caller has the option to provide their name and address to a live operator.

# Internet Website

In addition to the published notice, Internet presence (via www.RemeronSettlement.com) is an integral part and critical component of a Notice Program. Based on our experience in pharmaceutical antitrust cases, we have found this value-added service to be economical while promoting communication with CCS and Class members, who are comfortable using this

medium. CCS suggests the development of a website targeted at Consumer and TPP Class members, as outlined below.

**A.   Website Content and Capabilities** - Downloading Remeron Litigation document(s), addressing Frequently Asked Questions (FAQs), and corresponding with the Settlement Administrator and/or Counsel.

1.  The Notice of Class Action, Proposed Settlement and Fairness Hearing, Request for Future Notice, Claim Form and other related documents, if any, will be converted into easy-to-download Adobe® PDF formats and placed on the website for End-Payor Class members to download. This eliminates the wait time for hardcopy forms to be mailed upon request. In addition, the website will have the capability to enable consumers to file claims online.

2.  General information about the litigation, i.e. Summary Notice and a comprehensive list of Frequently Asked Questions (FAQs). Our experience provides us with insight to anticipated questions, both general and specific to the litigation. We will also work with Counsel to ensure that their concerns are included and addressed promptly and appropriately, as needed.

3.  E-mail capabilities will allow End-Payor Class members to communicate directly with the Settlement Administrator or Counsel, thus minimizing the need to call the toll-free hotline.

**B.   Search Engines** - Strategic search engine optimization for premium placement and ranking within the most common and popular search engines and links to other sites. Search engine/index registration will generate traffic in addition to other methods of site promotion. Listed below are some of the most widely used search engines/indexes and their respective URL that www.RemeronSettlement.com will be registered with.

| Search Engine/Index | URL |
|---|---|
| Google | Google.com |
| Yahoo | Yahoo.com |
| Search Partner Network | Dogpile.com, Webcrawler.com, Excite.com, Metacrawler.com |
| Inktomi | Lycos.com |
| Alta Vista | Altavista.com |
| Ask Jeeves | Askjeeves.com |

# Conclusion

The objective of this Notice Plan is to notify the largest number of potential class participants and provide them with sufficient exposure opportunities to see and understand the Settlement Notice.

Mile Marker Zero concludes that by implementing this plan, and assuming significant participation by TPPs, psychiatrists, and "earned" media components, the following reach and frequency can be attained:

| Notice Plan Audience Delivery | |
| --- | --- |
| Reach A55+ | Nearly 90% |
| Frequency A55+ | 2 5 times |

# Timelines and Scheduling

The Notice Plan will likely be required to be commenced within 90 days of the Court's Preliminary Approval Order and must be completed within 45 days from the date of commencement. To this end, the following pages provide a prototypical example of how the Notice plan would run over a 45-day period starting in January 2005. The timelines illustrate the scheduling of 1) the paid consumer media, including the pricing for each media vehicle in 2004, 2) direct mail "through" chain pharmacies, 3) direct mail notice "through" TPP Mailing Database, 4) direct mail "through" psychiatrists, and 5) "earned" media effort.

## Remeron Antitrust Notice Plan
### Timeline for Notice Plan 2005

10/18/2004

| Publication | November 2004 | | | | December 2004 | | | | January 2005 | | | | February | | | Total Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 8 | 15 | 22 | 29 | 6 | 13 | 20 | 27 | 3 | 10 | 17 | 24 | 31 | 7 | 14 | 21 | |
| Parade *<br>Notice Size: 2/5 page<br>Material Due: 12/15 | | | | | | | | | | 1/16 | | | | | | | $ 242,496 |
| USA Weekend *<br>Notice Size: 2/5 page<br>Material Due: 12/20 | | | | | | | | | | | 1/23 | | | | | | 179,733 |
| USA Today<br>Notice Size: 1/4 page<br>Material Due: 1/3 | | | | | | | | | | 1/10 | | | | | | | 28,440 |
| El Nuevo Día ^<br>Notice Size: 1/4 page<br>Material Due:1/3 | | | | | | | | | | 1/14 | | | | | | | $2,463 |
| Pacific Daily News<br>Notice Size: 1/4 page<br>Material Due: 1/5 | | | | | | | | | | 1/12 | | | | | | | $961 |
| Virgin Island Daily News<br>Notice Size: 1/4 page<br>Material Due: 1/5 | | | | | | | | | | 1/12 | | | | | | | $691 |
| National Underwriter<br>Notice Size: full page<br>Material Due: 12/27 | | | | | | | | | | | 1/17 | | | | | | $2.579 |
| BusinessWire | | | | | | | | | | 1/10 | | | | | | | |
| Direct Mail "through" Chain Pharmacies | | Contacting Chain Pharmacies | | | | | | | | 1/10 | | | | | | | |
| Direct Mail "through" TPP Mailing Database | | | | | | | | | | 1/10 | | | | | | | |
| Direct Mail "through" Psychiatrists** | | | | | | 12/13 | | | | | 1/17 | | | | | | |
| Earned Media | | Ongoing effort of contacing media, organizations, and other efforts | | | | | | | | | | | | | | | |

Total Media Cost 2004                                                                                   $   457,363

All rates are 2004 estimates   There is an expected increase for 2005 rates of approximately 10%
^ There may be a nominal charge for Spanish translation

# EXHIBIT 1

Exhibit 1

## SUMMARY NOTICE OF PROPOSED CLASS ACTION SETTLEMENT
### IF YOU PURCHASED AND/OR PAID FOR REMERON® OR ITS GENERIC EQUIVALENTS DURING THE PERIOD JUNE 15, 2001 THROUGH _____, 2004

### PLEASE READ THIS LEGAL NOTICE CAREFULLY
#### You May Be Entitled To A Cash Recovery In A Class Action Settlement

This Summary Notice is to inform you of the proposed settlement of class action lawsuits brought by the Attorneys General of the 50 states, Territories and Possessions, the Commonwealth of Puerto Rico, and the District of Columbia, and by the End-Payor Plaintiffs, and to inform members of the proposed Settlement Class of their rights. This notice is only a summary. **To obtain the full Notice, read the last section below.** The proposed settlement provides a total amount of up to $36,000,000.00 as described in more detail in the full Notice. The End-Payor Plaintiffs and the State Attorneys General each have concluded on the basis of their extensive economic, factual and legal investigation that the proposed settlement is fair, reasonable and adequate. The proposed settlement is subject to approval by the Court

#### Who is Part of the Settlement Class?
The proposed "Settlement Class" includes any person (or the estate of a person) **and** entities such as private or (non-federal) governmental hospitals, nursing homes, and Third Party Payors, such as health insurers, and any assignees, that purchased and/or paid all or part of the purchase price of Remeron® or its generic equivalents in the United States (including its Territories) during the period June 15, 2001 through _____, 2004. Excluded from the Settlement Class are all wholesalers and retailers and all persons or entities that purchased Remeron® or its generic equivalents primarily for purposes of resale. See the full Notice for other entities that are excluded from the Settlement Class

#### What is the Lawsuit About?
The State Attorneys General and End-Payor Plaintiffs have filed lawsuits alleging that Organon USA Inc. and Akzo Nobel N.V. (collectively, the "Defendants") violated federal and state antitrust laws by monopolizing and attempting to monopolize the United States market for Remeron® and its generic equivalents, which resulted in Defendants' unjust enrichment. Defendants have denied any wrongdoing or liability

#### What Are My Legal Rights?
If you are a member of the Settlement Class, you may have a right to share in the Settlement Fund, if this settlement is approved by the Court. The proposed settlement also includes a release of claims as further described in the full Notice. If you want to be excluded from the settlement and Settlement Class, you must mail a written request for exclusion, complying with the deadline, instructions and requirements set forth in the full Notice. The Court has scheduled a final approval hearing to be held at___:___ __ m. Eastern time on_____, 200_, in Courtroom _____, United States District Court for the District of New Jersey, Martin Luther King, Jr. Federal Building and United States Courthouse, 50 Walnut Street, Newark, New Jersey 07101-0999, before the Honorable Faith S. Hochberg on the proposed settlement and the applications for fees and costs and for incentive awards to the Class Representatives

#### HOW CAN I FILE A CLAIM?
To receive all future notices and a claim form, as well as the full Notice, you MUST either write the Settlement Administrator at:

**Remeron Antitrust Settlement**
**c/o Complete Claim Solutions, Inc.**
**P.O. Box 24769**
**West Palm Beach, FL 33416**
**OR** visit the website at www.RemeronSettlement.com, **OR** call toll-free at 1-866-401-6807

For additional information, you may write, call or e-mail the Settlement Administrator at the contact information above.

### PLEASE DO NOT CONTACT THE COURT, OR COUNSEL OR DEFENDANTS, FOR ADDITIONAL INFORMATION.

Headline font – 10.0
Text font – 8.0

# EXHIBIT 2

## Exhibit 2 - Target: Ailments/Remedies -- Used Prescription Remedy for Depression

|  | Total Audience (000) | Total Audience Using Prescription Drugs (000) | % Composition All | % Coverage Using Prescription Drugs | % Composition | Index |
|---|---|---|---|---|---|---|
| All | 205,368 | 11,953 |  | 100 00% | 6 52% | 100 |
| Men | 98,474 | 3,280 | 48.0% | 3 33% | 27 44% | 57 |
| Women | 106,894 | 8,673 | 52.0% | 8 11% | 72 56% | 140 |
| Age 18-24 | 27,019 | 1,078 | 13.2% | 3 99% | 9 02% | 69 |
| Age 25-34 | 37,936 | 1,711 | 18.5% | 4 51% | 14 31% | 77 |
| Age 35-44 | 44,776 | 2,733 | 21.8% | 6 10% | 22 86% | 105 |
| Age 45-54 | 38,134 | 3,110 | 18.6% | 8 16% | 26 02% | 140 |
| Age 55-64 | 24,287 | 1,673 | 11.8% | 6 89% | 14 00% | 119 |
| Age 65+ | 33,217 | 1,647 | 16.2% | 4.96% | 13 78% | 85 |
| Median Age |  | 46 4 |  |  |  |  |
| Employment: working full time | 131,849 | 6,447 | 64.2% | 4.89% | 53 94% | 84 |
| Employment: not working | 73,519 | 5,506 | 35.8% | 7.49% | 46.06% | 129 |
| HHI $75,000+ | 60,434 | 2,834 | 29.4% | 4.69% | 23 71% | 81 |
| HHI $60-74,999 | 23,716 | 1,370 | 11.5% | 5.78% | 11 46% | 100 |
| HHI $50-59,999 | 18,708 | 981 | 9.1% | 5.24% | 8 21% | 90 |
| HHI $40-49,999 | 20,902 | 1,197 | 10.2% | 5.73% | 10 01% | 98 |
| HHI $30-39,999 | 22,993 | 1,404 | 11.2% | 6.11% | 11.75% | 105 |
| HHI <$30,000 | 58,615 | 4,168 | 28.5% | 7.11% | 34 87% | 122 |
| Median HH Income |  | $43,173 |  |  |  |  |
| A County Size | 84,500 | 4,058 | 41.1% | 4.80% | 33.95% | 83 |
| B County Size | 61,610 | 3,975 | 30.0% | 6 45% | 33 26% | 111 |
| C County Size | 29,461 | 1,933 | 14.3% | 6.56% | 16 17% | 113 |
| D County Size | 29,797 | 1,986 | 14.5% | 6.67% | 16 62% | 115 |
| High School Grad or less | 100,824 | 6,024 | 49.1% | 5.97% | 50 40% | 103 |
| Attended College | 55,771 | 3,420 | 27.2% | 6.13% | 28 61% | 105 |
| College Grad + | 48,773 | 2,509 | 23.7% | 5 14% | 20 99% | 89 |
| Home Owned | 145,178 | 8,622 | 70.7% | 5 94% | 72 13% | 102 |
| Married | 117,121 | 6,675 | 57.0% | 5 70% | 55 84% | 98 |
| Single | 49,609 | 2,346 | 24.2% | 4.73% | 19 63% | 81 |
| Widowed/Divorced/Separated | 38,639 | 2,931 | 18.8% | 7 59% | 24 52% | 130 |
| 1 Person in Household | 27,958 | 1,834 | 13.6% | 6.56% | 15.34% | 113 |
| 2 People in Household | 69,305 | 4,375 | 33.7% | 6.31% | 36 60% | 109 |
| 3+ People in Household | 108,106 | 5,744 | 52.6% | 5 31% | 48 05% | 91 |
| New England Region | 10,370 | 667 | 5.0% | 6 43% | 5 58% | 112 |
| Mid-Atlantic Region | 33,289 | 1,538 | 16.2% | 4 62% | 12 87% | 79 |
| East Central Region | 26,817 | 1,743 | 13.1% | 6.50% | 14 58% | 111 |
| West Central Region | 31,062 | 1,660 | 15.1% | 5 34% | 13 89% | 92 |
| South East Region | 40,667 | 2,950 | 19.8% | 7 25% | 24 68% | 125 |
| South West Region | 23,633 | 1,311 | 11.5% | 5 55% | 10 97% | 95 |
| Pacific Region | 39,531 | 2,083 | 19.2% | 5 27% | 17 43% | 91 |

## Exhibit 2 - Target: Ailments/Remedies -- Used Prescription Remedy for Depression

| | Total Audience (000) | Total Audience Using Prescription Drugs (000) | % Composition All | % Coverage Using Prescription Drugs | % Composition | Index |
|---|---|---|---|---|---|---|
| **Media Quintiles** | | | | | | |
| **Magazines** | | | | | | |
| Heaviest Readership Q1 | 40,999 | 2,719 | 20.0% | 6.63% | 22.75% | 114 |
| Heavy Readership Q2 | 41,045 | 2,359 | 20.0% | 5.75% | 19.74% | 99 |
| Average Readership Q3 | 41,039 | 2,117 | 20.0% | 5.16% | 17.71% | 89 |
| Moderate Readership Q4 | 41,163 | 2,495 | 20.0% | 6.06% | 20.87% | 104 |
| Light Readership Q5 | 41,121 | 2,263 | 20.0% | 5.50% | 18.93% | 95 |
| | | | | | | |
| **Newspaper** | | | | | | |
| Heaviest Readership Q1 | 41,129 | 2,240 | 20.0% | 5.45% | 18.74% | 94 |
| Heavy Readership Q2 | 40,947 | 2,448 | 19.9% | 5.98% | 20.48% | 103 |
| Average Readership Q3 | 41,048 | 2,208 | 20.0% | 5.38% | 18.47% | 92 |
| Moderate Readership Q4 | 41,159 | 2,493 | 20.0% | 6.06% | 20.86% | 104 |
| Light Readership Q5 | 41,086 | 2,564 | 20.0% | 6.24% | 21.45% | 107 |
| | | | | | | |
| **Radio** | | | | | | |
| Heaviest Listening Q1 | 40,913 | 2,330 | 19.9% | 5.70% | 19.49% | 98 |
| Heavy Listening Q2 | 41,166 | 2,273 | 20.0% | 5.52% | 19.02% | 95 |
| Average Listening Q3 | 41,258 | 2,193 | 20.1% | 5.32% | 18.35% | 91 |
| Moderate Listening Q4 | 41,019 | 2,512 | 20.0% | 6.12% | 21.02% | 105 |
| Light Listening Q5 | 41,013 | 2,645 | 20.0% | 6.45% | 22.13% | 111 |
| | | | | | | |
| **TV** | | | | | | |
| Heaviest Viewing Q1 | 41,077 | 3,114 | 20.0% | 7.58% | 26.05% | 130 |
| Heavy Viewing Q2 | 41,030 | 2,434 | 20.0% | 5.93% | 20.36% | 102 |
| Average Viewing Q3 | 41,007 | 2,174 | 20.0% | 5.30% | 18.19% | 91 |
| Moderate Viewing Q4 | 41,006 | 2,051 | 20.0% | 5.00% | 17.16% | 86 |
| Light Viewing Q5 | 41,248 | 2,181 | 20.1% | 5.29% | 18.25% | 91 |
| | | | | | | |
| **Internet** | | | | | | |
| Heaviest Usage Q1 | 23,836 | 1,480 | 11.6% | 6.21% | 12.38% | 107 |
| Heavy Usage Q2 | 23,658 | 1,342 | 11.5% | 5.67% | 11.23% | 98 |
| Average Usage Q3 | 23,889 | 1,265 | 11.6% | 5.30% | 10.58% | 91 |
| Moderate Usage Q4 | 23,907 | 1,343 | 11.6% | 5.62% | 11.24% | 97 |
| Light Usage Q5 | 23,774 | 1,323 | 11.6% | 5.56% | 11.07% | 95 |
| | | | | | | |
| **TV Viewing Prime Time** | | | | | | |
| Heaviest Viewing Q1 | 40,930 | 2,682 | 19.9% | 6.55% | 22.44% | 113 |
| Heavy Viewing Q2 | 41,097 | 2,532 | 20.0% | 6.16% | 21.18% | 106 |
| Average Viewing Q3 | 41,200 | 2,224 | 20.1% | 5.40% | 18.61% | 93 |
| Moderate Viewing Q4 | 41,032 | 2,313 | 20.0% | 5.64% | 19.35% | 97 |
| Light Viewing Q5 | 41,108 | 2,201 | 20.0% | 5.35% | 18.41% | 92 |
| | | | | | | |
| **TV Viewing Day Time** | | | | | | |
| Heaviest Viewing Q1 | 20,264 | 1,714 | 9.9% | 8.46% | 14.34% | 145 |
| Average Viewing Q2 | 20,393 | 1,453 | 9.9% | 7.12% | 12.16% | 123 |
| Light Viewing Q3 | 20,475 | 1,305 | 10.0% | 6.37% | 10.92% | 109 |

Source: 2003 Doublebase Mediamark Research Inc. weighted Pop. (000)

# EXHIBIT 3

## Exhibit 3 - Consumer Publication Audience Analysis

Universe: Adults - Total U S
Target: Respondent Age 55 or more
Population: 54,760 (000)
% of Universe: 27 59

| Magazine Name | Audience (Thousands) | Percent Coverage | Percent Composition |
|---|---|---|---|
| Metro-Puck Comics Network | 26,289 | 48 0 | 30.3 |
| Parade | 24,415 | 44 6 | 30.7 |
| Reader's Digest | 16,758 | 30 6 | 37.2 |
| USA Weekend | 14,785 | 27 0 | 33.0 |
| Modern Maturity | 11,780 | 21.5 | 77 8 |
| Better Homes & Gardens | 9,718 | 17 7 | 29.0 |
| National Geographic | 8,195 | 15 0 | 27.5 |
| Good Housekeeping | 7,836 | 14.3 | 32 8 |
| Sunday Mag/Net | 7,563 | 13 8 | 28.9 |
| TV Guide | 7,528 | 13 7 | 22.5 |
| Family Circle | 7,287 | 13.3 | 33.6 |
| Woman's Day | 6,340 | 11.6 | 31.2 |
| Time | 5,590 | 10.2 | 25.6 |
| Ladies' Home Journal | 5,531 | 10.1 | 36.2 |
| Newsweek | 4,638 | 8.5 | 24.7 |
| McCall's | 4,607 | 8.4 | 34.0 |
| Consumer Reports | 4,558 | 8.3 | 28.4 |
| Southern Living | 4,078 | 7.4 | 33.2 |
| Prevention | 3,956 | 7.2 | 37.9 |
| Tribune Sunday | 3,518 | 6 4 | 30.5 |
| U S.News & World Report | 3,055 | 5 6 | 30.2 |
| House & Garden | 3,042 | 5.6 | 27.9 |
| Country Living | 3,000 | 5.5 | 31.1 |
| National Enquirer | 3,036 | 5.5 | 23.6 |
| Redbook | 2,536 | 4.6 | 24.6 |
| Smithsonian | 2,364 | 4.3 | 35.1 |
| Field & Stream | 2,292 | 4.2 | 21.2 |
| Tribune Sunday | 2,268 | 4.1 | 29.9 |
| Consumers Digest | 1,952 | 3.6 | 30.8 |
| House Beautiful | 1,909 | 3.5 | 29.7 |
| Money | 1,940 | 3 5 | 24.1 |
| Popular Mechanics | 1,918 | 3 5 | 22.4 |
| American Legion | 1,860 | 3 4 | 62.4 |
| Cooking Light | 1,854 | 3 4 | 28.7 |
| Country Home | 1,784 | 3.3 | 23.2 |
| Woman's World | 1,738 | 3 2 | 22.9 |
| Health | 1,696 | 3 1 | 28.8 |
| Bon Appetit | 1,543 | 2.8 | 29.8 |
| Flower & Garden | 1,558 | 2.8 | 29 3 |
| Star | 1,550 | 2.8 | 22.3 |
| VFW Magazine | 1,497 | 2 7 | 60 8 |
| Golf Digest | 1,489 | 2 7 | 25 1 |
| Saturday Evening Post | 1,409 | 2.6 | 42 4 |
| Organic Gardening | 1,409 | 2.6 | 36 2 |
| Sunset | 1,443 | 2 6 | 29.9 |
| Family Handyman | 1,359 | 2.5 | 33 7 |
| Golf Magazine | 1,351 | 2.5 | 23 2 |
| Gourmet | 1,296 | 2 4 | 26 3 |
| Popular Science | 1,308 | 2 4 | 21 4 |
| Travel & Leisure | 1,278 | 2 3 | 28 2 |

## Exhibit 3 - Consumer Publication Audience Analysis

Universe: Adults - Total U S
Target: Respondent Age 55 or more
Population: 54,760 (000)
% of Universe: 27 59

| Magazine Name | Audience (Thousands) | Percent Coverage | Percent Composition |
|---|---|---|---|
| Outdoor Life | 1,212 | 2.2 | 22.7 |
| Country Music | 1,164 | 2.1 | 26.5 |
| Catholic Digest | 1,095 | 2.0 | 43.2 |
| Midwest Living | 1,014 | 1.9 | 40.4 |
| Forbes | 1,067 | 1.9 | 24.8 |
| National Geographic Traveler | 1,014 | 1.9 | 24.7 |
| Architectural Digest | 1,022 | 1.9 | 22.9 |
| Kiplinger's Personal Finance | 987 | 1.8 | 32.1 |
| Los Angeles Times Magazine | 985 | 1.8 | 28.7 |
| Wall Street Journal | 973 | 1.8 | 28.1 |
| New York Times (Sunday) | 1,007 | 1.8 | 27 5 |
| Yankee | 949 | 1.7 | 42.3 |
| The New Yorker | 921 | 1.7 | 33.0 |
| American Rifleman | 956 | 1.7 | 23 3 |
| USA Today | 933 | 1.7 | 20.4 |
| Business Week | 890 | 1 6 | 20.5 |
| Chicago Tribune Magazine | 838 | 1 5 | 31.5 |
| Sports Afield | 822 | 1 5 | 29 0 |
| Town & Country | 801 | 1 5 | 28.3 |
| Food & Wine | 813 | 1 5 | 20 4 |
| New York Times (Daily) | 782 | 1 4 | 28 8 |
| Mutual Funds | 738 | 1 3 | 27.7 |
| Conde Nast Traveler | 692 | 1 3 | 26.4 |
| North American Fisherman | 737 | 1 3 | 19.7 |
| Washington Post (Sunday) | 633 | 1 2 | 26 0 |
| Smart Money | 630 | 1.2 | 22 6 |
| Scientific American | 669 | 1.2 | 22 0 |
| Workbench | 625 | 1.1 | 31.8 |
| Victoria | 615 | 1.1 | 22 6 |
| Audubon | 563 | 1.0 | 36.4 |
| Texas Monthly | 547 | 1.0 | 27.7 |
| Walking Magazine | 550 | 1 0 | 25.7 |
| TRUE Story | 556 | 1.0 | 23.7 |
| Traditional Home | 547 | 1.0 | 21.0 |
| Your Money | 480 | 0.9 | 28.4 |
| Endless Vacation | 506 | 0.9 | 25.6 |
| Harper's Bazaar | 519 | 0 9 | 19.7 |
| Natural History | 443 | 0.8 | 29.8 |
| Boating | 449 | 0.8 | 19.4 |
| Golf World | 381 | 0 7 | 23.3 |
| Southern Accents | 396 | 0.7 | 23.3 |
| Southwest Spirit | 364 | 0.7 | 20.2 |
| Atlantic Monthly | 352 | 0 6 | 33.9 |
| Barron's | 323 | 0.6 | 28 5 |
| Flying | 290 | 0 5 | 24.7 |
| New York Magazine | 291 | 0 5 | 24.5 |
| Sierra | 255 | 0.5 | 19 5 |
| Tennis | 222 | 0.4 | 21 5 |
| Attache | 240 | 0.4 | 20 1 |
| American Way | 203 | 0 4 | 19 4 |

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE REMERON END-PAYOR ANTITRUST LITIGATION ) ) ) ) | MASTER FILE NO. 02-CV-2007 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS ) ) ) ) | Hon. Faith S. Hochberg |

**ORDER CONDITIONALLY CERTIFYING SETTLEMENT CLASS,**
**APPROVING REPRESENTATION OF ATTORNEYS GENERAL AND**
**PRELIMINARILY APPROVING PROPOSED SETTLEMENT**

Upon review and consideration of the Settlement Agreement dated September 28, 2004, the attachments thereto which have been publicly filed with the Court, and "Rider A" filed separately under seal therewith (collectively, the "Settlement Documents"), and having been fully advised in the premises, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

**Preliminary Approval of Settlement and**
**Conditional Certification of the Settlement Class**

1.      The Court has jurisdiction over these actions and each of the Parties.

2.      The Court, for purposes of this Order, adopts the definitions set forth in the Settlement Agreement.

3.      "Rider A" shall be accepted and filed under seal. The Court finds that it is appropriate for "Rider A" to be maintained under seal in light of the Court's determination that the terms of "Rider A" are not relevant to the evaluation and determination by members of the proposed Settlement Class described and defined herein as to whether the Settlement (defined below) proposed to this Court is fair and adequate to such members and/or to the Settlement Class.

4.    The terms of the Settlement Agreement, including the attachments and "Rider A," are hereby preliminarily approved, subject to further consideration at the Fairness Hearing provided for below.  The Court preliminarily finds that the settlement embodied in the Settlement Agreement (the "Settlement") falls sufficiently within the range of possible approval so that notice of the Settlement should be given as provided in this Order.

5.    For purposes of the Settlement and the Settlement Agreement only and pending final approval of the Settlement Agreement and the Settlement, the Court conditionally certifies a Settlement Class consisting of:

> All End Payors (including any assignees of such End Payors) who purchased and/or paid all or part of the purchase price of Mirtazapine Products in the United States during the period beginning June 15, 2001 through the date of this Preliminary Approval Order.  Excluded from the Settlement Class are (i) Defendants and any of their subsidiaries and affiliates, (ii) all federal governmental entities, agencies and instrumentalities, and (iii) all wholesalers and retailers and all persons or entities that purchased Mirtazapine Products primarily for purposes of resale.

Pursuant to the Settlement Agreement, the United States is deemed to comprise the 50 states of the United States of America, the District of Columbia, the Commonwealth of Puerto Rico, and all possessions and territories of the United States of America.

6.    The Court preliminarily finds that the proposed Settlement Class meets all applicable requirements of Fed. R. Civ. P. 23.

7.    The Court preliminarily approves as class representatives United Food and Commercial Workers Local 56 Health & Welfare Fund, Board of Trustees of United Food and Commercial Workers Local 56 Health & Welfare Fund, Vista Healthplan, Inc., Gayle Taylor, Dianne Mason and Robert Kapella, and/or on behalf of natural person members of the Settlement Class who reside in their respective states the Attorneys General of Connecticut, Georgia,

2

Indiana, Iowa, Massachusetts, Nebraska, North Dakota, Oklahoma, South Carolina, Utah, and Wisconsin (the "Class Representatives").

8.      If the Settlement Agreement does not become Effective in accordance with its terms, the certification of the Settlement Class shall be null and void, and shall have no further force and effect, and Plaintiffs and Defendants shall have reserved and shall retain all of their rights to propose or oppose for any reason any and all class certification motions or the standing of any Plaintiff, and Defendants shall have reserved and shall retain all of their rights to contest the adequacy of any proposed class or of Plaintiffs or any Class Representative to serve as representatives of any putative class or of any Plaintiff State, whether acting through its Attorney General or any other official, to represent any person or entity or class of persons and/or entities.

9.      The Court preliminarily finds the below-listed counsel have adequately and fairly represented the Settlement Class:

> Arthur M. Kaplan, Esq.
> Fine, Kaplan and Black, RPC
> 1845 Walnut Street, 23rd Floor
> Philadelphia, Pennsylvania 19103
>
> Joseph H. Meltzer, Esq.
> Schiffrin & Barroway, L.L.P.
> Three Bala Plaza East, Suite 400
> Bala Cynwyd, Pennsylvania 19004
>
> *Plaintiffs' Co-Lead Counsel*
>
> Patricia A. Conners, Esq.
> Director, Antitrust Division
> Elizabeth G. Arthur, Esq.
> Assistant Attorney General
> Office of the Attorney General
> State of Florida
> The Capitol, Plaza Level One
> Tallahassee, Florida 32399-1050

3

Kim Van Winkle, Esq.
Assistant Attorney General
Antitrust and Civil Medicaid Fraud Division
Office of Attorney General
State of Texas
P.O. Box 12548
Austin, Texas 78711-2548

       *State Liaison Counsel*

### Notice To Potential Settlement Class Members

10.    The Court finds that the form and content of the proposed Notice of Settlement (the "Notice") and the Notice Plan proposed by Plaintiffs are in full compliance with the requirements of Federal Rule of Civil Procedure 23, state equitable, statutory, and common law authority, and due process. The Court further finds that the Notice provides to the members of the Settlement Class sufficient information to make informed and meaningful decisions regarding their options in this litigation and the effect of the Settlement on their rights, and that the Notice and the Notice Plan constitute the best method of notice practicable under the circumstances. The Court approves the Notice and the Notice Plan.

11.    The Court finds that the proposed 45-day Notice Period is adequate for members of the Settlement Class to exercise their rights to object to the proposed Settlement or to exclude themselves from the proposed Settlement Class. The Notice Period shall begin on _____ \_\_\_, 2004, and end on _____ \_\_\_, 200\_\_.

12.    Plaintiffs' Co-Lead Counsel and State Liaison Counsel shall cause the Notice to be disseminated to the Settlement Class in accordance with the Notice Plan and the terms of this Order. Prior to the Fairness Hearing, Plaintiffs' Co-Lead Counsel and State Liaison Counsel shall serve and file or cause to be served and filed sworn statements attesting to compliance with the Notice Plan.

4

1512865v1

13.     The Court may, for good cause, extend the hearing date or any of the deadlines set forth in this Order without further notice to the Settlement Class; *provided* that the Court shall consult with the Representatives before extending any such deadline to permit the Representatives to attempt to make any modifications to any other deadlines contemplated by the Settlement Agreement that may become necessary or appropriate as a result of any such extension.  The Court may approve the Settlement with only such modifications (if any) as may be agreed to in a writing signed by all of the Parties, if appropriate, without further notice to the Settlement Class.

### Requests for Exclusion From the Settlement Class

14.     Settlement Class members that submit valid and timely requests for exclusion from the Settlement Class postmarked on or before _____ ___, 2004 (the "Opt-Out Deadline"), pursuant to and complying with the instructions contained in the Notice, shall not have any rights under the Settlement Agreement or the Settlement, and shall not be bound by the Settlement Agreement, the Settlement or the Final Judgment and Order.  **[N.B.:  OPT-OUT DEADLINE SHOULD BE THE SAME AS THE LAST DAY OF THE NOTICE PERIOD IN PARA. 11]**

15.     All members of the Settlement Class who do not submit valid and timely requests for exclusion from the Settlement Class postmarked on or before the Opt-Out Deadline pursuant to and complying with the instructions contained in the Notice shall be bound by the Settlement Agreement, the Settlement and the Final Judgment and Order, in the event that the Settlement Agreement and the Settlement are finally approved by the Court and the Settlement Agreement becomes Effective in accordance with its terms.

16.     If a potential Third Party Payor member of the Settlement Class mails a timely request for exclusion, but does not provide the information relating to its Third Party

5

Payor Opt-Out Purchases requested by the Notice of Settlement to be included in any such request for exclusion, counsel for Defendants, Plaintiffs' Co-Lead Counsel and/or State Liaison Counsel may proceed with discovery against any such Third Party Payor Settlement Class member without the need for further application to this Court or any other court of competent jurisdiction; *provided* that, in such event, if counsel for Defendants, Plaintiffs' Co-Lead Counsel and/or State Liaison Counsel are unable to obtain such information as they shall deem satisfactory for the purpose of determining Total Third Party Payor Opt-Out Purchases, due to the failure of any such Third Party Payor to produce such information, the Court shall entertain application of the Representatives at that time to strike such Third Party Payor's request for exclusion; *further provided* that in the event that counsel for Defendants, Plaintiffs' Co-Lead Counsel and/or State Liaison Counsel obtain information demonstrating that the information provided by any Third Party Payor relating to Third Party Payor Opt-Out Purchases in such request for exclusion differs materially from such Third Party Payor's actual Opt-Out Purchases, the Court shall entertain application of the Representatives at that time to strike such Third Party Payor's request for exclusion.

### Confidentiality

17.     No information received by the Settlement Administrator (defined below) in connection with the Settlement that pertains to a particular member of the Settlement Class, nor any information contained in a request for exclusion (other than the identity of the person or entity requesting exclusion), shall be disclosed to any person or entity other than counsel to the Parties to the Settlement Agreement or the Court.

### Fairness Hearing

18.     A hearing on final settlement approval (the "Fairness Hearing") shall be held before this Court on _____, 200__, at __:__ __.m. Eastern time, in the courtroom

6

assigned to the Honorable Faith S. Hochberg, U.S.D.J., at the United States District Court for the District of New Jersey, Martin Luther King, Jr. Federal Building and United States Courthouse, 50 Walnut Street, Newark, New Jersey 07101-0999. At the Fairness Hearing, the Court will consider: (a) the fairness, reasonableness and adequacy of the Settlement and the Settlement Agreement, (b) whether the Settlement Class should be certified, for settlement purposes only, (c) whether the Court should approve awards of attorneys' fees and expenses to State Liaison Counsel and Plaintiffs' Co-Lead Counsel as described in the Settlement Agreement, (d) whether incentive awards should be awarded to certain named Plaintiffs who participated in prosecuting this litigation and achieving the Settlement, and (e) whether entry of a Final Judgment and Order terminating this litigation, in the form submitted by the Parties to the Settlement Agreement, should be entered.

19.    All briefs and materials of any Party in support of final approval of the Settlement and the Settlement Agreement and entry of the Final Judgment and Order proposed by the Parties to the Settlement Agreement and the fee petition by Plaintiffs' Co-Lead Counsel and any application for incentive awards to named End-Payor Plaintiffs, shall be served on the Representatives identified in Paragraph 20 of this Order and filed with this Court at least thirty (30) calendar days before the Fairness Hearing.

20.    Any member of the Settlement Class who or that has not filed a valid and timely request for exclusion in the manner set forth herein may appear at the Fairness Hearing in person or by counsel and may be heard, to the extent allowed by the Court, either in support of or in opposition to any of the matters described in items (a) through (e) listed above in Paragraph 18, only if, on or before the Opt-Out Deadline, said person or entity: (a) files with the Clerk of the United States District Court for the District of New Jersey, Martin Luther King, Jr. Federal Building and United States Courthouse, 50 Walnut Street, Newark, New Jersey 07101-0999, a

7

notice of such person's intention to appear ("Notice of Appearance"), as well as a statement (the "Statement") indicating the basis for such person's support of or opposition to the Settlement, or such other matter listed in any of divisions (a) through (e), inclusive, of Paragraph 18, or the dismissal of claims, or the entry of final judgment, and all papers, briefs and other materials in support of such position; and (b) serves copies of such Notice of Appearance, Statement and all papers, briefs and other materials that such person files with the Clerk, either in person or by mail, by the same date, on the following Representatives:

Arthur M. Kaplan, Esq.
Fine, Kaplan and Black, RPC
1845 Walnut Street, 23rd Floor
Philadelphia, Pennsylvania 19103

Joseph H. Meltzer, Esq.
Schiffrin & Barroway, L.L.P.
Three Bala Plaza East, Suite 400
Bala Cynwyd, Pennsylvania 19004

*Plaintiffs' Co-Lead Counsel*

Patricia A. Conners, Esq.
Director, Antitrust Division
Elizabeth G. Arthur, Esq.
Assistant Attorney General
Office of the Attorney General
State of Florida
The Capitol, Plaza Level One
Tallahassee, Florida 32399-1050

Kim Van Winkle, Esq.
Assistant Attorney General
Antitrust and Civil Medicaid Fraud Division
Office of Attorney General
State of Texas
P.O. Box 12548
Austin, Texas 78711-2548

*State Liaison Counsel*

Joseph Rebein, Esq.
Shook, Hardy & Bacon LLP
2555 Grand Boulevard
Kansas City, Missouri  64108-2613

     *Counsel for Defendants*

21.    Any member of the Settlement Class who does not file, and serve on all Representatives, an objection within the time and in the manner provided in the Notice and this Order shall be deemed to have waived any such objection by appeal, collateral attack or otherwise.

### Settlement Administrator

22.    The Court hereby approves and appoints Complete Claim Solutions, Inc. to serve as the settlement administrator for the Settlement (the "Settlement Administrator"). The Settlement Administrator shall ensure that the members of the Settlement Class receive notice of the Settlement as set forth in the Notice Plan and shall review, process and recommend the approval or disapproval by the Court of the timely filed proofs of claim of members of the Settlement Class and pay those claims which are approved to Settlement Class members entitled to participate in the Settlement, pursuant to a plan of distribution to be jointly proposed by Plaintiffs' Co-Lead Counsel and State Liaison Counsel and to be approved by the Court.

### Other Provisions

23.    Pending the Court's final determination of whether the Settlement and the Settlement Agreement should be finally approved, neither the Plaintiffs nor any member of the Settlement Class, either directly, representatively, or in any other capacity, shall commence or prosecute any action or proceeding in any court or tribunal asserting any of the Released Claims, nor shall any Releasor (within the meaning of the Settlement Agreement) seek to establish liability or assert Claims on behalf of itself or any person or entity or class thereof against any of the Releasees, in whole or in part, for any of the Released Claims. The Releasors have

9

covenanted and agreed, to the fullest extent permitted by law, that they shall not hereafter seek to establish liability or assert Claims, on behalf of themselves or any other person or entity or class thereof, against any of the Releasees, in whole or in part, for any of the Released Claims. Upon the Effective Date of the Settlement, if the Releasors, or any member of the Settlement Class who has not timely and validly excluded itself from the Settlement Class and the Settlement, seeks to establish liability or assert any of the Released Claims in violation of Section II.B of the Settlement Agreement, then this Court or any court of competent jurisdiction may enter an injunction restraining prosecution of such proceeding.

24.     After review of the proposed Notice Plan, the Court approves the expenditure of actual notice and administrative costs reasonably incurred in the amount and manner and to the extent provided for in Articles III and VI of the Settlement Agreement, for the purpose of providing Notices to members of the Settlement Class in accordance with the Notice Plan. The Escrow Agent is directed to pay such costs as they have been or are hereafter reasonably incurred upon joint written notice from the Representatives, as provided in the Settlement Agreement and the Escrow Agreement.

25.     All proceedings in these actions against the Defendants are hereby stayed until such time as the Court renders a final decision regarding the approval of the Settlement and the Settlement Agreement and, if it approves the Settlement and the Settlement Agreement, enters the Final Judgment and Order as and in the form provided in the Settlement Agreement and dismisses these actions with prejudice.

26.     In the event the Settlement Agreement and the Settlement are terminated in accordance with the provisions of the Settlement Agreement, the Settlement Agreement, the Settlement, and all related proceedings shall, except as expressly provided to the contrary in the Settlement Agreement, become null and void, shall have no further force and effect, and the

1512865v1

Plaintiffs shall retain full rights to assert any and all causes of action against Releasees and Defendants, and Releasees and Defendants shall retain any and all defenses and counterclaims thereto. These actions shall thereupon revert forthwith to their respective procedural and substantive status prior to the date of execution of the Settlement Agreement and shall proceed as if the Settlement Agreement, and all other related orders and papers, including the Injunction, had not been executed; and upon application of the Representatives, this Court shall enter an order authorizing the Parties to resume and complete discovery in these actions.

27.     The Court finds that the Attorneys General of the Plaintiff States have the authority to represent, and settle and release the Released Claims of, (a) their respective states, (b) the past, present and future departments, bureaus, and agencies of the Plaintiff States as actual or alleged purchasers or reimbursers, (c) natural persons residing in their respective states, and (d) all other Releasors on whose behalf the Plaintiff States have agreed and purport to act pursuant to Section I.NN.1 of the Settlement Agreement.

28.     Neither this Order nor the Settlement Agreement nor any other Settlement Document nor anything contained herein or therein or contemplated hereby or thereby nor any proceedings undertaken in accordance with the terms set forth in the Settlement Agreement, the Settlement Documents or herein, shall constitute, be construed as or be deemed to be evidence of or an admission or concession by Defendants as to the validity of any claim that has been or could have been asserted against any or all of them or as to any liability by any or all of them or as to any matter set forth in this Order, nor construed as or deemed to be evidence of or an admission or concession by any Plaintiff as to the absence of validity of any such claim or as to the validity of any defense. Neither this Order nor the Settlement Agreement nor any other Settlement Document, nor any of their provisions, nor any statement or document made or filed in connection herewith or therewith, shall be filed, offered, received in evidence or otherwise

11

used in this or any other action or proceeding or in any arbitration, except to consummate or

enforce the Settlement Agreement or the terms of this Order.

SO ORDERED this _____ day of _____, 2004.

_____
Faith S. Hochberg
United States District Court Judge
U.S. District Court for the District of New Jersey

12

1512865v1