UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

|  |  |
|---|---|
| IN RE REMERON END-PAYOR ANTITRUST LITIGATION | ) ) ) ) |
|  | ) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | ) ) ) |

MASTER FILE NO. 02-CV-2007

Hon. Faith S. Hochberg

MEMORANDUM OF LAW IN SUPPORT OF
END-PAYOR PLAINTIFFS' AND PLAINTIFF STATES'
MOTION FOR FINAL APPROVAL OF SETTLEMENT

# **TABLE OF CONTENTS**

Table of Authorities ................................................................................................. iii

I.   INTRODUCTION .............................................................................................. 1

II.  HISTORY OF THE CASE .................................................................................. 3

    A.   Nature of the Action ................................................................................. 3

    B.   The Case Was Extensively Litigated Prior to Settlement ....................... 5

    C.   Settlement Negotiations .......................................................................... 10

    D.   Settlement-Related Proceedings to Date ................................................ 11

III. THE PROPOSED SETTLEMENT ..................................................................... 13

    A.   Monetary Payments and Distributions ................................................... 13

        (1)   The Settlement Fund ...................................................................... 14

        (2)   The Notice Fund ............................................................................. 15

        (3)   Payment to State Attorneys General ............................................. 16

        (4)   Any Unclaimed Money .................................................................. 16

    B.   Injunctive Relief ..................................................................................... 16

    C.   Release of Claims ................................................................................... 17

IV.  THE NOTICE OF SETTLEMENT WAS THE BEST PRACTICABLE
    UNDER THE CIRCUMSTANCES .................................................................... 19

    A.   Description of Notice Plan and Claims Procedure ................................. 20

        (1)   Notice Plan ..................................................................................... 20

            a.   Published Notice .................................................................. 21

            b.   Mailed Notice ...................................................................... 22

            c.   News Media .......................................................................... 23

            d.   Toll-Free Telephone Number ............................................... 24

            e.   Internet Website .................................................................... 24

    f.  Results of Notice Efforts ............................................................ 24

B.  The Proposed Notice Plan and Claims Procedures Meet the
   Requirements of Due Process ................................................................ 25

V. THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE ........................ 26

A.  The Settlement is Entitled to a Presumption of Fairness ..................................... 26

B.  Standards for Judicial Approval of Settlements ............................................... 33

C.  The Proposed Settlement Satisfies All the Criteria for Final Approval ............. 36

   (1)  The Complexity, Expense and Likely Duration of the Litigation ........... 36

   (2)  The Reaction of the Settlement Group ...................................................... 37

   (3)  The Stage of the Proceedings and the Amount of Discovery
      Completed .................................................................................................. 38

   (4 & 5) The Risks of Establishing Liability and Damages ..................................... 40

   (6)  Risks of Maintaining Class Action Status Through Trial ......................... 43

   (7)  Defendants' Ability to Withstand a Greater Judgment ............................. 44

   (8 & 9) The Terms of the Settlement in Relation to the Strength of
      Plaintiffs' Case ......................................................................................... 44

      (i)  Estimated Damages ..................................................................... 46

      (ii)  Comparison of the Settlement Amount to Estimated
         Damages and Weighed Against the Risks of Non-Recovery ....... 47

VI. DISTRIBUTION OF THE SETTLEMENT FUND ............................................... 48

VII. CLASS CERTIFICATION FOR SETTLEMENT PURPOSES ..................................... 50

A.  Settlement Case Representation ........................................................................ 51

B.  Conditional Class Certification for Settlement Purposes Only ........................... 52

   (1)  End-Payor Plaintiffs and Plaintiff States Have Satisfied All
      Prerequisites for Class Certification ....................................................... 53

      (a)  Numerosity ................................................................................... 54

      (b)  Commonality ................................................................................ 55

|     | (c) | Typicality | 57 |

(c)   Typicality ................................................................................ 57

(d)   Adequacy of Representation ....................................................... 59

(2)   A Class Action Will Avoid the Risk of Inconsistent Adjudications ....... 61

(3)   Questions of Law and Fact Common the Class Predominate ............... 62

(4)   A Class Action is Superior to Other Available Methods for the
        Fair and Efficient Adjudication of this Controversy .................... 64

VIII.   Conclusion ................................................................................................ 66

# TABLE OF AUTHORITIES

## CASES

*Amchem Prod., Inc. V. Windsor*, 521 U.S. 591 (1997) ................................................ 50, 51, 62, 63

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994) ........................................ 55, 57, 58, 61, 62

*Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304 (3d Cir. 1993) ............................................. 34

*Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977) ............................................. 58

*Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799 (3d Cir. 1974) ............................... 34

*Bullock v. Administrator of Kircher's Estate*, 84 F.R.D. 1 (D.N.J. 1979). ................... 34

*California v. ARC America Corp.*, 490 U.S. 93 (1989) ................................................ 30

*Cannon v. Cherry Hill Toyota, Inc.*, 184 F.R.D. 540 (D.N.J. 1999) ........................ 54, 63

*Carlough v. Amchem Products, Inc.*, 158 F.R.D. 314 (E.D. Pa. 1993) ......................... 26

*Carlson v. General Motors Corp.*, C.A. No. 86-2674 (D.S.C.) .................................... 29

*Chattanooga Foundry & Pipe Works v. Atlanta*, 203 U.S. 390 (1906) ........................ 46

*Colorado v. Airline Tariff Publ'g Co.*, 1995 WL 792070 (D.D.C. May 10, 1995) ....... 30

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ....................................................... 33

*Cumberland Farms, Inc. v. Browning-Ferris Indus.*, 120 F.R.D. 642 (E.D. Pa. 1988) ............. 54

*Cusick v. NV Nederlandsche Combinatie Voor Chemische Industrie*, 317 F. Supp. 1022
   (E.D. Pa. 1970) ...................................................................................................... 57

*Daniel B. v. O'Bannon*, 633 F. Supp. 919 (E.D. Pa. 1986) ........................................ 34

*Davis v. Southern Bell Tel. Co.*, 1993 WL 593999 (S.D. Fla. Dec. 23, 1993) ......... 62, 64

*Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326 (1980) .......................................... 65

*Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ............................................. 47

*Doe v. Delie*, 257 F.3d 309 (3d Cir. 2000) ................................................................. 33

*Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir. 1985) ................................................ 55, 63

*Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15 (N.D. Cal. 1980) ........................... 32

*Erie County Retirees Assoc. v. County of Erie, Pennsylvania*, 192 F. Supp. 2d 369
(W.D. Pa. 2002) ..................................................................................................... 44

*Fisher Bros. v. Cambridge-Lee Indus., Inc.*, 630 F. Supp. 482 (E.D. Pa. 1985) ........................... 34

*Foe v. Cuomo*, 700 F. Supp. 107 (E.D.N.Y. 1988) ........................................................... 25

*General Tel. Co. v. Falcon*, 457 U.S. 147 (1982) ........................................................... 43

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975) ......................................................... 35, 44

*Grasty v. Amalgamated Clothing and Textile Workers Union*,
828 F.2d 123, 130 (3d Cir. 1987) ................................................................................ 58

*Grunin v. Int'l. House of Pancakes*, 513 F.2d 114 (8th Cir. 1975) ........................................ 20

*Hammon v. Barry*, 752 F. Supp. 1087 (D.D.C. 1990) ................................................... 45, 48

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ............................................. 54, 57

*Hassine v. Jeffes*, 846 F.2d 169 (3d Cir. 1988) ...................................................... 57, 61

*Henry v. Sears Roebuck & Co.*, 1999 WL 33496080 (N.D. Ill. July 23, 1999) ............................... 48

*Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912 (3d Cir. 1992) ................................... 59, 63

*Illinois v. Bristol-Myers Co.*, 470 F.2d 1276 (D.C. Cir. 1972) ........................................... 57

*In re Agent Orange Prod. Liability Litig.*, 818 F.2d 179 (2d Cir. 1987) .................................. 49

*In re Ampicillin Antitrust Litig.*, 55 F.R.D. 269 (D.D.C. 1972) .......................................... 60

*In re Ampicillin Antitrust Litig.*, 82 F.R.D. 652 (D.D.C. 1979) .......................................... 47

*In re Antibiotic Antitrust Actions*, 333 F. Supp. 278 (S.D.N.Y. 1971) ............................ 55, 56, 60

*In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109 (D.N.J. 2002) ........................................ 25

*In re Buspirone Antitrust Litig.*, No. 01-cv-11401, M.D.L. No. 1413
(S.D.N.Y. May 7, 2003) .......................................................................................... 32

*In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618 (E.D. Mich. 2000) .............................. 64

*In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297 (E.D. Mich. 2001) ................................... 64

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003),
*cert. denied*, ___ S.Ct. ___, 2005 WL 637193 (May 23, 2005) .................................... 51, 56, 60

*In re Catfish Antitrust Litig.*, 826 F. Supp. 1019 (N.D. Miss. 1993) ............................... 58, 62, 65

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) ............................................... 27

*In re Commercial Explosives Antitrust Litig.*, 945 F. Supp. 1489 (D. Utah 1996) ...................... 30

*In re Copper Antitrust Litig.*, M.D.L. No. 1303 (7th Cir.) ............................................ 30

*In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*,
   906 F.2d 432 (9th Cir. 1990) ...................................................................... 30

*In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484 (E.D. Pa. 2003) ............................. 34

*In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244 (S.D. Tex. 1978) ................. 54, 59, 65

*In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993) ......................... 28

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768
   (3d Cir. 1995) .................................................................................... 33

*In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403 (S.D. Tex. 1999) ................................... 28

*In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002),
   *cert. denied*, 538 U.S. 977 (2003) ............................................................... 64

*In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631 (E.D. Pa. 2003) .............................. 36

*In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Pa. June 2, 2004) .......................... 36

*In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619 (E.D. Pa. 2004) .......................... 26, 44

*In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12 (D.D.C. 2001) ......... 56, 58, 63, 64

*In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002) ............ 36, 48, 60

*In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 WL 22037741
   (D.D.C. June 16, 2003 ) ........................................................................... 29

*In re M.D.C. Holdings Sec. Litig.*, 1990 WL 454747 (S.D. Cal. Aug. 30, 1990) ......................... 39

*In re Minolta Camera Prod. Antitrust Litig.*, 668 F. Supp. 456 (D. Md. 1987) ......................... 35

*In re Nasdaq Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996) ...... 54, 59, 62, 65

*In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) ............ 28, 29, 32

*In re Nat'l Student Mktg. Litig.*, 68 F.R.D. 151 (D.D.C. 1974) ....................................... 45

*In re Panasonic Consumer Elec. Prod. Antitrust Litig.*, 1989 WL 63240
   (S.D.N.Y. June 5, 1989) ........................................................................... 30

*In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348 (N.D. Ga. 2000) .................... 30

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283 (3d Cir. 1998) ..... 51, 58, 63

*In re Remeron Antitrust Litig.*, 335 F. Supp. 2d 522 (D.N.J. 2004) ............................................... 41

*In re Remeron Direct Purchaser Antitrust Litig.*, ___ F. Supp. 2d ___,
    2005 WL 1023317 (D.N.J. Feb. 18, 2005) ......................................................................... 42

*In re School Asbestos Litig.*, 789 F.2d 996 (3d Cir. 1986) ............................................................ 55

*In re School Asbestos Litig,* 921 F.2d 1330 (3d Cir 1990) ........................................................... 33

*In re Shopping Carts Antitrust Litig.*, 1983 WL 1950 (S.D.N.Y. Nov. 18, 1983) ........................ 32

*In re Sorbates Direct Purchaser Antitrust Litig.*, C98-4886 (N.D. Cal. 2001) ........................... 29

*In re Terazosin Hydrochloride*, 220 F.R.D. 672 (S.D. Fl. 2004) ................................................... 66

*In re Toys 'R' Us Antitrust Litig.*, 191 F.R.D. 347 (E.D.N.Y. 2000) .......................... 25, 26, 33, 35

*In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68 (E.D.N.Y. 2000) ....................... 62

*In re Vitamins Antitrust Litig.*, 1999 WL 1335318 (D.D.C. Nov. 23, 1999) ................................. 38

*In re Vitamins Antitrust Litig.*, 2000 WL 1737867 (D.D.C. Mar. 31, 2000) ................................ 48

*In re Warfarin Sodium Antitrust Litig,* 212 F.R.D. 231 (D. Del. 2002),
    *aff'd*, 391 F.3d 516 (3d Cir. 2004) ................................................................................... 34

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) ..... 33, 35, 37, 39, 40, 43-45,
    51, 55, 56, 59, 60, 64, 65

*Jennings Oil Co. v. Mobil Oil Co*, 80 F.R.D. 124 (S.D.N.Y. 1978) ............................................. 65

*Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290 (W.D. Pa. 1997) .............................................. 44

*McGuinness v. Parnes*, 1989 WL 29814 (D.D.C. Mar. 22, 1989) ................................................ 28

*Minnesota v. United States Steel Corp.*, 44 F.R.D. 559 (D. Minn. 1968) .................................... 57

*Mullane v. Central Hanover Bank & Trust Co*, 339 U.S. 306 (1950) ......................................... 26

*New York v. Reebok Int'l. Ltd.*, 96 F.3d 44 (2d Cir. 1986) ........................................................... 32

*New York v. Reebok Int'l. Ltd*, 903 F. Supp. 532 (S.D.N.Y. 1995) ........................................ 32, 35

*Newman v. Stein*, 464 F.2d 689 (2d Cir. 1972) ............................................................................. 34

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001) ......... 55, 57

*Nichols v. SmithKline Beecham Corp.*, 2005 WL 950616 (E.D. Pa. Apr. 22, 2005) ................. 36

*Organon, Inc. v. Mylan Pharm., Inc.*, 293 F. Supp. 2d 453 (D.N.J. 2003) ......................... 41

*Parsky v. Wachovia Bank, N.A.*, 2001 WL 535786 (C.C.P. Phila. May 8, 2001) ................ 30

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ............................................. 20

*Rendler v. Gambone Bros. Dev. Co.*, 1999 WL 252395 (E.D. Pa. Apr. 27, 1999) ................ 35

*Ryan-House v GlaxoSmithKline*, C.A. 2:03cv442 (E.D. Va.) ....................................... 29

*Seidman v. Am. Mobile Sys.*, 157 F.R.D. 354 (E.D. Pa. 1994) .................................... 57

*Shepherd Park Citizens Ass'n v. General Cinema Beverages of Washington, D.C., Inc.*,
   584 A.2d 20 (D.C. App.1990) ................................................................... 45

*Slomovics v. All for a Dollar, Inc.*, 906 F. Supp. 146 (E.D.N.Y. 1995) ......................... 37

*Sollenbarger v. Mountain States Tel. and Tel. Co.*, 121 F.R.D. 417 (D.N.M. 1988) ........... 64, 66

*State of New York v. Keds Corp.*, 1994 WL 97201 (S.D.N.Y. Mar. 21, 1994) ................... 32

*States and Commonwealths of Texas, Florida, Oregon v. Organon USA*,
   C.A. No. 04-5126 ............................................................................. 11

*Stephenson v. Bell Atlantic Corp.*, 177 F.R.D. 279 (D.N.J. 1997) ............................ 59, 63

*Stewart v. Rubin*, 948 F. Supp. 1077 (D.D.C. 1996) ............................................ 28

*Sutton v. Medical Service Ass'n of PA*, 1994 WL 246166 (E.D. Pa. June 8, 1994) ............. 29

*Transamerican Ref. Corp. v. Dravo Corp.*, 130 F.R.D. 70 (S.D. Tex. 1990) ..................... 57

*Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207 (D.N.J. 2005) ................ 25

*Verizon Communications v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004) ............. 42

*Wachtel v. Guardian Life Ins. Co.*, 223 F.R.D. 196 (D.N.J. 2004) ............................. 54

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965) .............. 40

*Walsh v. Great Atlantic and Pacific Tea Co.*, 96 F.R.D. 632 (D.N.J. 1983). .................. 34

*Weinberger v. Kendrick*, 698 F.2d 61 (2d Cir. 1982) .......................................... 26

*Weiss v. York Hosp.*, 745 F.2d 786 (3d Cir. 1984) ........................................ 54, 58, 61

*Wellman v. Dickinson*, 497 F. Supp. 824 (S.D.N.Y. 1980) ............................................................... 32

*West Virginia v. Chas Pfizer & Co., Inc.*, 440 F.2d 1079 (2d Cir. 1971) ............................... 61

*Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239 (3d Cir. 1975) ............................................. 59, 61

*Williams v. First Nat'l Bank*, 216 U.S. 582 (1910) ..................................................................... 33

*Young Soon Oh v. AT & T Corp.*, 225 F.R.D. 142 (D.N.J. 2004) ................................................. 44

## RULES and STATUTES

Fed. R. Civ. P. 23 ....................................................................................................................... passim

Sherman Act, 15 U.S.C. § 2 ............................................................................................................ 4

Hatch-Waxman Act, 21 U.S.C. § 355 ............................................................................................. 4

Health Insurance Portability and Accountability Act of 1996 (HIPAA), Public Law 104-91,
   42 U.S.C. §1320 .................................................................................................................... 26

122 Cong. Rec. 30,868 (1976) ...................................................................................................... 61

Cal. Civ. Code § 1542 (West 2005) ............................................................................................. 18

## FEDERAL REGULATIONS

21 C.F.R. § 314.53(b) ................................................................................................................... 41

45 C.F.R. §160.103 ....................................................................................................................... 26

## OTHER AUTHORITIES

Herbert Newberg & Alba Conte, Newberg on Class Action, Appendix 8-4 (3d ed. 1992) ......... 48

Herbert Newberg & Alba Conte, Newberg on Class Actions (4th ed. 2002) ............................. 28

Manual for Complex Litigation, Third (West 1999) .................................................................... 28

Manual for Complex Litigation, Fourth (West 2004) .................................................................. 65

Phillip Areeda and Herbert Hovenkamp, Antitrust Law § 394 (Aspen Law & Business,
   Sec. Ed., Vol. II) .................................................................................................................... 46

Julian O. VonKalinowski, 6 Antitrust Laws and Trade Regulation (1991) ............................... 63

## I.    INTRODUCTION

End-Payor Plaintiffs and Plaintiff States respectfully submit this Memorandum of Law in support of their Motion for Final Approval of their proposed settlement with Defendants Organon USA Inc. and Akzo Nobel N.V. ("Defendant" or "Organon"), and for final certification of a settlement class pursuant to Fed. R. Civ. P. 23. The motion seeks (1) the Court's final approval of the settlement, (2) final certification of the End-Payor Settlement Class, and (3) final approval of the Plan of Distribution. End-Payor Plaintiffs and Plaintiff States respectfully request that the Court enter the Final Approval Order and the Order and Stipulated Injunction attached as Exhibits 1 and 2 to the Notice of Motion in Support of End-Payor Plaintiffs' and Plaintiff States' Motion for Final Approval of Settlement, filed herewith.

The settlement provides for the payment of up to $36 million, plus interest, and the imposition of injunctive relief. Court approval of the settlement will resolve all claims brought by the End-Payor Plaintiffs and Plaintiff States ("States") alleging illegal maintenance of a monopoly for Remeron® and conspiracy to further that monopoly.

The settlement is fair, reasonable and adequate, and it should be approved pursuant to Fed. R. Civ. P. 23(e)(1)(C).[1] The settlement is the culmination of years of hard fought and hotly contested litigation. And, as the Court knows, the settlement is also the product of protracted, difficult arms-length negotiations, which began in a multi-day mediation before former Judge Politan, proceeded through a multi-day settlement conference that was directly supervised by this Court and, even after a settlement agreement was reached in principle in this Court's chambers, required many months of intense negotiations over the language of the final Settlement Agreement.

---

[1] A copy of the Settlement Agreement and its exhibits was filed with the Court on October 20, 2004, together with the motion by End-Payor Plaintiffs and the States for preliminary settlement approval (doc. # 135).

At the time agreement with the Defendants was reached, counsel for the End-Payor class and Plaintiff States were fully educated about the case. Counsel had reviewed hundreds of thousands of documents covering every aspect of Organon's anti-generic strategy; extensive motion practice had occurred; and over 50 depositions already had been taken. Counsel also had consulted extensively with experts on numerous aspects of the case, including various damage theories.

Since the time the settlement agreement was reached in principle in this Court's chambers, subsequent events have proven the result achieved for the End Payor class to be extraordinary. While the counsel for the End Payor class always appreciated the substantial risk posed by Defendants' defenses, after the settlement was reached the Court made numerous rulings in the Direct Purchaser cases that, putting it charitably, seriously weakened the plaintiffs' side of the case. These included rulings that: (1) Defendants' Orange Book listing of the '099 patent was not improper and therefore could not form the basis of an antitrust claim; (2) Defendants' approval-blocking patent litigation against generic competitors based on the '099 patent was brought in good faith and was therefore entitled to Noerr-Pennington immunity; (3) no antitrust claims could proceed based on Defendants' attempts to obtain pediatric exclusivity for Remeron®; and (4) the class plaintiffs lacked standing to assert Walker Process fraud claims based on Defendants' prosecution and obtaining of the '099 patent. Because Defendants' conduct surrounding the obtaining, listing, and assertion of the '099 patent against generic competitors was in large part the centerpiece of the End Payors' antitrust and other claims in this case, in light of the Court's subsequent rulings -- which basically decimated these claims -- we believe the settlement we have achieved on behalf of the End Payor class is nothing short of remarkable, and it should be approved.

As an integral term of the Settlement Agreement, the parties seek class certification for settlement purposes of the Settlement Class of all End Payors (including any assignees of such End Payors) who purchased and/or paid all or part of the purchase price of Mirtazapine Products in the United States during the period June 15, 2001 through January 25, 2005 (the date of the Court's Order preliminarily approving the settlement (doc. # 146)), which is the "Class Period." An "End Payor" for these purposes includes any person (or the estate of a person) that was a consumer who purchased and/or paid all or part of the purchase price of Mirtazapine Products in the United States during the Class Period; it also includes entities such as private or (non-federal) governmental hospitals, nursing homes, and Third Party Payors ("TPPs"), such as health insurers, that purchased and/or paid all or part of the purchase price of Mirtazapine Products in the United States during the Class Period. Excluded from the Settlement Class are Defendants and any of their subsidiaries and affiliates; all federal governmental entities, agencies and instrumentalities; and all wholesalers and retailers and all persons or entities that purchased Mirtazapine Products primarily for purposes of resale.

Finally, under the proposed Plan of Distribution, the net settlement amount (*i e* , the settlement fund less notice and claims administration costs, attorneys' fees, expenses, and incentive awards) will be allocated as follows:  32.8% to consumers, 16.5% to state governmental purchasers, and 50.7% to TPPs.

## II.    HISTORY OF THE CASE[2]

### A.    Nature of the Action

On April 25, 2002, the End-Payor Plaintiffs filed the first class action complaint against

---

[2] The factual assertions in this section are supported by the Declaration of Joseph H. Meltzer In Support of Motions for Final Approval of Settlement and Award of Attorneys' Fees and Reimbursement of Expenses, attached as Exhibit A hereto.  For ease of reading, specific citations to the Meltzer Declaration have not been included.

Defendants.[3]  Complaints were filed in 2002 by United Food and Commercial Workers Local 56 Health & Welfare Fund, Board of Trustees of United Food and Commercial Workers Local 56 Health & Welfare Fund, Vista Healthplan, Inc., Gayle Taylor, Dianne Mason and Robert Kapella (collectively, "End-Payor Plaintiffs") in *Gayle Taylor v. Organon Inc. and Akzo Nobel N.V.,* No. 02-cv-02007-FSH-PS (D.N.J.); *Robert Kapella v. Organon Inc. and Akzo Nobel N.V.,* No. 02-cv-02384-FSH (D.N.J.); *Vista Healthplan, Inc. v. Organon, Inc. and Akzo Nobel, N.V.,* No. 02-cv-04364-SWK (S.D.N.Y.); and *United Food and Commercial Workers Local 56 Health & Welfare Fund and Board of Trustees of the United Food and Commercial Workers Local 56 Health and Welfare Fund v. Organon Inc. and Akzo Nobel N.V.,* No. 02-cv-03153-FSH-PS (D.N.J.).  These complaints were followed by a Consolidated Class Action Complaint filed on September 11, 2002, and thereafter by End-Payor Plaintiffs' Amended Consolidated Class Action Complaint (the "Complaint") in *In re Remeron End-Payor Antitrust Litigation,* Master Docket No. 02-CV-2007 (D.N.J), filed January 5, 2004.

The Complaint alleges violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and violations of state antitrust and/or unfair competition statutes.  It alleges that Defendants obtained United States Patent No. 5,977,099 ("the '099 patent") through fraud on the United States Patent and Trademark Office.  It further alleges that Defendants improperly listed the '099 patent in the United States Food and Drug Administration's ("FDA's") "Approved Therapeutic Equivalence Evaluations" (the "Orange Book") to preserve their monopoly, and also improperly delayed the listing of that patent in the Orange Book to prolong their monopoly, and thereafter improperly commenced lawsuits asserting sham claims of patent infringement under the Hatch-Waxman Act, 21 U.S.C. § 355, and the United States patent laws against generic drug companies

---

[3] The End-Payor complaints preceded the filing of the Direct Purchaser complaints, which are not included in this proposed settlement.

("Generic Manufacturers"), which sought permission to market generic versions of Organon's antidepressant drug, Remeron®.

The Complaint alleges that Defendants did all of this in order to forestall the market entry of FDA-approved generic versions of Remeron® (that is to say, competing Mirtazapine Products). It further alleges that, as a result of Defendants' conduct End-Payors, including Third-Party Payors (such as health benefit funds, HMOs, health insurers and hospitals), governmental entities and consumers, were required to purchase brand-name Remeron® at monopoly prices instead of generic Mirtazapine Products at a fraction of the price. It alleges that absent Defendants' illegal activities, patients would have been able to purchase lower-priced generic Mirtazapine Products earlier in time, at a savings of millions of dollars.

### B.    The Case Was Extensively Litigated Prior to Settlement

This litigation was complex and hotly contested by Defendants from the outset, beginning with Defendants' initial unsuccessful efforts to obtain a stay from then-Magistrate Judge Chesler.

On December 18, 2002, after the End-Payor Plaintiffs already had filed their Amended Consolidated Complaint, this Court granted summary judgment in favor of certain Generic Manufacturers with respect to Organon's patent claims against them. Following that decision, class action complaints and individual complaints were filed by various Direct Purchasers, which are not part of this proposed settlement.

The Court entered an Amended Case Management Order No.1 on June 18, 2003, after the filing of the Direct Purchaser cases, providing coordinated discovery in the End-Payor Class Actions, the Direct Purchaser cases, and with respect to antitrust counterclaims filed by the Generic Manufacturers. This was followed by an Amended Case Management Order No. 1,

filed June 12, 2003; a First Amendment to Case Management Order No. 1 filed July 1, 2003; a Coordination and Case Management Order filed July 16, 2003; a Coordination and Case Management Order filed August 11, 2003; an Amended Coordination and Case Management Order filed December 11, 2003; and many Orders regarding discovery, including but not limited to discovery Orders dated or filed on September 26, 2003; December 23, 2003; January 15, 2004; January 16, 2004; February 3, 2004; February 10, 2004; and February 13, 2004. Discovery was extensive and intensive, as discussed below.

On December 3, 2003, the Court granted Defendants' motion to dismiss certain of the antitrust counterclaims by Generic Manufacturers, including Generic Manufacturers' antitrust counterclaims alleging that the '099 patent had been improperly listed by Defendants in the FDA's Orange Book for anticompetitive reasons, and Generic Manufacturers' antitrust counterclaims alleging that the Defendants' patent litigation against the Generic Manufacturers was objectively and subjectively baseless and brought for anticompetitive purposes to prolong Defendants' monopoly. Motions by the Generic Manufacturers for reconsideration of that decision were filed on December 12, 2003 and December 15, 2003, and were pending at the time of the proposed End-Payor Plaintiff settlement.

End-Payor Plaintiffs conducted an extensive economic and factual investigation. This included review of approximately 800,000 pages of documents and data produced by Defendants and third parties, including hundreds of thousands of documents relating to Defendants' various anti-generic strategies for Remeron®.

Among other things, End-Payor Plaintiffs reviewed and analyzed voluminous documentation relating to Defendants' internal patent planning and life cycle management strategy; Defendants' regulatory and Orange Book listing strategies; Defendants' clinical

development files, which contained additional documentation regarding other regulatory exclusivity strategies for Remeron® ; Defendants' patent files, including file wrapper and patent prosecution history documentation; and numerous scientific and medical articles and other publications which impacted upon the issues of non-infringement and invalidity of the '099 patent.

End-Payor Plaintiffs also conducted extensive research into the various legal and regulatory issues in this case, including an analysis of various FDA regulations and the case law interpreting those regulations. End-Payor Plaintiffs performed an exhaustive analysis of the various possible time-line scenarios for generic entry in the but-for world (i.e., if Defendants had never obtained, listed or asserted the '099 patent against generic competitors), which by itself necessitated yet more review of FDA regulations and procedures and a thorough working knowledge of FDA review and approval practice. We also engaged in a thorough review and analysis of the case law relating to the validity and infringement issues raised by Defendants' assertion of the '099 patent against generic competitors, including the evolving case law on inducement of infringement theories predicated upon ANDA filings under Hatch Waxman.

End-Payor Plaintiffs' counsel also took the lead in pressing Defendants on the adequacy of their document production at a hearing on December 19, 2003, and through a Notice of Deposition of Corporate Defendants Pursuant to Fed. R. Civ. P. 30(b)(6)–Designee of Organon Defendants Regarding Document Production, and a letter brief on February 2, 2004.

We also took the depositions of numerous current or former employees of the Defendants. These included many high-level executives and employees, who were deposed on complicated and highly technical issues relating to Defendants' various legal, regulatory, marketing and other anti-generic strategies for Remeron®. We also consulted heavily with

7

counsel for the Direct Purchasers, counsel for the Generic Manufacturers, the State Attorneys General and others. In all, over 50 depositions had been taken -- on a rigorous double- and often triple-track deposition schedule -- by the time we reached an agreement in principle with Defendants to settle this case.

The End-Payor Plaintiffs also provided extensive discovery, including Rule 26 Initial Disclosures on October 15, 2002, answers to interrogatories on September 8, 2003 and supplemented thereafter, voluminous document production, and deposition testimony by the two institutional End-Payor Plaintiff Class Representatives, Vista Healthplan, Inc. and United Food and Commercial Workers Local 56 Health & Welfare Fund.

In addition, End-Payor Plaintiffs engaged and met extensively with economic and other experts to develop support for theories of liability and to measure the monetary harm suffered by End Payors of Remeron®. As noted below, the End-Payor Plaintiffs have concluded on the basis of their extensive discovery, and factual and legal investigation, that the proposed Settlement is fair, reasonable and adequate.

Defendants moved to dismiss or stay the End-Payor Plaintiffs' Consolidated Amended Complaint on November 14, 2002. End-Payor Plaintiffs filed a comprehensive Memorandum in Opposition to Defendants' Motion to Dismiss or Stay on January 17, 2003, and a Notice of Supplemental Authority in opposition on February 6, 2003, as well as a letter brief regarding subsequent authority on April 25, 2003, and a letter brief on further supplemental authority on June 3, 2003. Defendants filed their Reply Memorandum in Support of Motion to Dismiss or Stay on February 21, 2003, and filed a response to End-Payor Plaintiffs' April 25 letter brief on May 8, 2003, and a response to End-Payor Plaintiffs' June 3 letter brief on June 5, 2003.

Defendants opposed End-Payor Plaintiffs' motion for leave to file the End-Payor

Plaintiffs' Consolidated Amended Complaint. End-Payor Plaintiffs filed an extensive

Memorandum of Law in Support of Plaintiffs' Motion for Leave to Amend on November 18,

2003. After briefing and oral argument, the Court granted End-Payor Plaintiffs' motion for

leave to amend on December 31, 2003. Following oral argument, Defendants' initial motion to

dismiss was denied as moot in light of End-Payor Plaintiffs' Amended Consolidated Complaint,

by Order dated January 15, 2004.

Defendants thereafter moved to dismiss End-Payor Plaintiffs' Amended Consolidated

Class Action Complaint on January 20, 2004. Defendants' motion to dismiss was undecided at

the time of the proposed Settlement.

End-Payor Plaintiffs moved to certify a nationwide class of End Payors, including

consumers as well as public (non-federal) and private institutional End Payors, on October 27,

2003. End-Payor Plaintiffs filed a comprehensive Memorandum of Law in Support of Plaintiffs'

Motion for Class Certification, together with a detailed and extensive Declaration from Harvard

University health economist Professor Richard G. Frank in support of class certification. That

motion for class certification was undecided at the time of the proposed Settlement.

At the same time that the End-Payor Plaintiffs were developing their case, the working

group of State Attorneys General were conducting their own economic and factual investigation

relating to the claims, underlying events, and conduct alleged by the End-Payor Plaintiffs and

others. Beginning in March 2003, the Office of the Attorney General of Texas issued Civil

Investigative Demands (CIDs) for documents and answers to written interrogatories to the

Defendants and to third parties, including the Generic Manufacturers. A multi-state working

group of State Attorneys General that was formed during the summer of 2003 conducted a

targeted review of the 200 CD-ROMs of document images produced in response to the CIDs.

The working group also reviewed transcripts of depositions and hearings from the patent

litigation and the End-Payor and Direct Purchaser litigation. The State Attorneys General also

researched and analyzed may legal and regulatory issues involving patents, the FDA and the

Hatch-Waxman process. In addition, the State Attorneys General gathered data relating to

purchases of Remeron® from their state agencies, including their state Medicaid programs, as

well as sales and pricing data from the Defendants and the Generic Manufacturers, and retained

economists to analyze the data and create damages estimates. The State Attorneys General

undertook extensive legal research and analysis and consulted with economic and intellectual

property law experts regarding the theories of liability at issue in this case. As noted below, the

State Attorneys General have concluded on the basis of their factual and legal investigation that

the proposed Settlement is fair, reasonable and adequate.

### C. Settlement Negotiations

In December 2003, the parties began to explore the possibility of settlement. The

working group of State Attorneys General participated in the negotiation of the proposed

Settlement. The settlement negotiations included a multi-day global settlement mediation before

Judge Politan in January 2004. This was followed by a series of settlement discussions between

Defendants' and End-Payor Plaintiffs' counsel in coordination with the working group of State

Attorneys General.

These discussions laid the groundwork, but settlement was not achieved until the end of a

two-day settlement conference before this Court. Under the Court's auspices, End-Payor

Plaintiffs' counsel and the working group of State Attorneys General were able to reach

agreement in principle with Defendants on the broad outlines of settlement at the end of a series

of settlement discussions conducted by the Court. The broad outlines of this agreement were

discussed with the Court in chambers on February 18, 2004, and the material terms of the

parties' agreement were transcribed by the Court's official reporter.

For the next seven months, the End-Payor Plaintiffs and the States together engaged in

extensive further negotiations with Defendants to craft and finalize the detailed written

Settlement Agreement, as well as many additional negotiations to craft and finalize the escrow

agreement, the proposed preliminary approval order, the proposed final judgment, and the class

notice of the proposed settlement. The working group of State Attorneys General, in conjunction

with the Federal Trade Commission, engaged in many further negotiations with Defendants to

craft and finalize the Stipulated Injunction; they also invited the State Attorneys General who

were not involved in the working group to join the Settlement.

### D.    Settlement-Related Proceedings to Date

On October 20, 2004, End-Payor Plaintiffs and the Plaintiff States filed their

Memorandum in Support of End-Payor Plaintiffs' and States' Motion for Preliminary Approval

of Proposed Settlement. Contemporaneous with the filing of that Memorandum, a Complaint

including all of the 50 States, the District of Columbia, and all U.S. territories was filed with the

Court, along with the Settlement Agreement, executed by the District of Columbia and such

territories and all 50 States. See *States and Commonwealths of Texas, Florida, Oregon, et al. v.*

*Organon USA Inc. and Akzo Nobel N.V.*, Civil Action No. 04-5126 (FSH) (Complaint filed Oct.

20, 2004).

On November 17, 2004, the Court issued an Order requesting End-Payor Plaintiffs and

Plaintiff States submit a brief addressing in further detail their proposed Notice Plan. On

November 24, 2004, End-Payor Plaintiffs and Plaintiff States submitted a Supplemental

Memorandum in Further Support of Plaintiffs' Motion for Preliminary Approval that addressed the issues raised in the Court's November 16 Order.

On December 1, 2004, the Court held a hearing on the proposed preliminary approval of the settlement. At that hearing, the Court requested that the parties develop a proposed Plan of Distribution and include details regarding that plan in the Notices. As described in more detail below, the parties did develop a proposed Plan of Distribution and revised the Notice to include its details. On January 14, 2005, the End-Payor Plaintiffs and Plaintiff States submitted a Second Supplemental Memorandum in Further Support of Plaintiffs' Motion for Preliminary Approval, setting forth the proposed Plan of Distribution and revised Notices.

On January 24, 2005, the Court sent an e-mail to the parties requesting additional information regarding certain language in the proposed order and the notice. That same day, the End-Payor Plaintiffs and Plaintiff States answered the Court's questions by return e-mail and revised the Long-Form and Short-Form Notices in response to the Court's inquiries.

On January 25, 2005, the Court entered an Order Conditionally Certifying Settlement Class, Approving Representation of Attorneys General and Preliminarily Approving Proposed Settlement.

In compliance with the Settlement Agreement and the Court's January 25, 2005 Order, and as described in more detail below, Defendants paid $35 million into escrow on February 1, 2005.

Then the parties embarked on the process of carrying out the Notice Plan approved by the Court. The claims administrator, Complete Claim Solutions ("CCS"), mailed 13,431 Notice Packages to Third-Party Payor ("TPP") Class Members. As of May 25, 2005, CCS had caused to be mailed 854,046 Consumer Notice Packets to potential Consumer Class Members, including packets mailed with the cooperation of pharmacies. The media consultant retained by CCS

published the Summary Notice in national publications, such as *Reader's Digest, Parade, USA Today* and *USA Weekend* to further target Consumer Class Members. To provide adequate coverage for Class Members residing in one of the United States Territories, the media consultant published Summary Notice in El Nuevo Dia, the Pacific Daily News and the Virgin Islands Daily News. The media consultant also published the Summary Notice in an industry periodical, National Underwriter, to reach TPP Class Members. Additionally, CCS contacted 22,643 physicians, and numerous mental health, senior and women's organizations soliciting their assistance in notifying their members of the settlement. CCS distributed Public Service Announcements ("PSAs") to 1,000 radio stations. As of May 25, 2005, 60 radio stations reported airing the PSAs a total of 11,179 times. CCS designed and developed a website for potential Class Members to obtain information and for Consumer Class Members to file a claim online; and CCS set up and operates a toll-free 800 telephone number to answer class member questions. As of May 25, 2005, over 40,000 visits have been made to the website and nearly 30,000 calls have been made to the toll-free telephone number.

### III.   THE PROPOSED SETTLEMENT

As noted above, a copy of the Settlement Agreement and its exhibits was filed with the Court on October 20, 2004, together with the motion by End-Payor Plaintiffs and the States for preliminary settlement approval (doc. # 135). The following is a summary of the principal terms of the Settlement Agreement.

### A.   Monetary Payments And Distributions

The settlement provides for settlement payments by Defendants in a total amount of up to Thirty-Six Million Dollars ($36,000,000.00) (the "Settlement Consideration"), portions of which will be paid into escrow and may accumulate interest, dividends and other distributions and payments as they are held in escrow. The Settlement Consideration consists of: (1) Thirty-

Three Million Dollars ($33,000,000 00) that Defendants paid into an escrow account on February 1, 2005, plus any interest, dividends and other distributions and payments earned on that sum while in escrow (the **"Settlement Fund"**); plus (2) Two Million Dollars ($2,000,000.00) that Defendants paid on February 1, 2005 into a separate Escrow Account to pay for costs and expenses of settlement class notice and future costs of settlement administration, plus any interest, dividends and other distributions and payments earned on that sum while in escrow (the **"Notice Fund"**); plus (3) up to One Million Dollars ($1,000,000.00) that the Defendants will pay to the States following the Effective Date of the Settlement Agreement for their reasonable attorneys' fees and expenses incurred in their investigations of Defendants relating to this matter and in connection with the approval and administration of this settlement. These payments, and their purposes and use, are further described below.

**(1)** **The Settlement Fund.** On February 1, 2005, Defendants deposited with the Escrow Agent the sum of Thirty-Three Million Dollars ($33,000,000.00), which, along with any interest or income accumulated on that sum, constitute the Settlement Fund. The Settlement Fund may be used for purposes of distribution to the members of the Settlement Class and the Plaintiff States, payment of further notice or administrative costs in excess of the amount of the Notice Fund up to $500,000.00, and payment of End-Payor Plaintiffs' attorneys' fees and costs, and incentive awards for the class representatives, all subject to further Court order.

End-Payor Plaintiffs' Co-Lead Counsel and State Liaison Counsel jointly proposed a Plan of Distribution to the Court, which they believe will fairly and adequately address the issues of settlement administration and allocation among the members of the Settlement Class and the Plaintiff States. Under the proposed plan, the net settlement amount (*i e*, the settlement fund less notice and claims administration costs, attorneys' fees, expenses, and incentive awards) will

be allocated as follows: 32.8% to consumers, 16.5% to state governmental purchasers, and 50.7% to TPPs.

Contemporaneous with the filing of this motion, End-Payor Plaintiffs' Co-Lead Counsel have applied to the Court for an award from the Settlement Fund of attorneys' fees equal to $7.8 million (plus 25% of the accrued interest on the Settlement Fund), as well as reimbursement of the almost $500,000.00 in expenses (including expert fees and costs) which they paid on behalf of the Settlement Class.  If approved by the Court, these attorneys' fees and expenses will be distributed by End-Payor Plaintiffs' Co-Lead Counsel among the ten (10) law firms that investigated, initiated and litigated these End Payor cases and paid all expenses, on behalf of End-Payor Plaintiffs.

In addition, certain End-Payor Plaintiffs spent a significant amount of their own time and expense litigating these cases for the benefit of the absent members of the Settlement Class. End-Payor Plaintiffs seek an award of incentive awards to such plaintiffs in the amount of Seventy-Five Thousand Dollars ($75,000.00), to be paid from the Settlement Fund.

If the proposed settlement is finally approved by the Court, the Settlement Fund, net of such costs, fees, expenses and awards, will be distributed to the Settlement Class members pursuant to the Plan of Distribution approved by the Court.

**(2) The Notice Fund.**  Defendants deposited with the Escrow Agent a separate amount of Two Million Dollars ($2,000,000.00) that was and is being used exclusively for the payment of actual notice and administrative fees and costs reasonably incurred for the purpose of providing notice of settlement to members of the Settlement Class, processing claims and administering the settlement, paying any Taxes and Tax Expenses with respect to the Escrow Accounts, and paying reasonable fees and costs to the Escrow Agent in accordance with the

terms of the Escrow Agreement. Beginning 45 days after the Opt-Out Deadline (April 27, 2005), any such reimbursable costs in excess of this amount may be paid from the Settlement Fund, subject to Court approval and, prior to the Effective Date of the Settlement Agreement, subject to an aggregate ceiling of $500,000.

(3) **Payment to State Attorneys General.** After the Effective Date of the Settlement Agreement, Defendants will reimburse the Plaintiff States for their reasonable attorneys' fees and expenses incurred in connection with their investigations of Defendants relating to this matter, as well as their future reasonable attorneys' fees and expenses to be incurred in connection with settlement approval and administration. The aggregate amount of all such fees and expenses of all Plaintiff States that shall be reimbursable shall not exceed One Million Dollars ($1,000,000.00), and will be paid in addition to, rather than from, the Settlement Fund. This reimbursement of the Plaintiff States' fees and expenses is subject to Court approval.

(4) **Any Unclaimed Money.** It sometimes occurs that because of uncashed checks, some funds remain following settlement distribution. Any amount in the Settlement Fund that remains after payment of all claims, Court-approved fees, costs, expenses, and incentive awards, and any supplemental distribution to Settlement Class members and Court-approved supplemental fees and costs, will be distributed to charitable organizations or state agencies that provide health or legal services to Settlement Class members, as recommended by End-Payor Plaintiffs' Co-Lead Counsel and/or State Liaison Counsel and approved by the Court.

B.       **Injunctive Relief**

Defendants have agreed to an injunction prohibiting certain future conduct, as specified in the Settlement Agreement (the "**Injunction**"), which will become effective only when the Settlement Agreement becomes Effective in accordance with its terms. This Order and

Stipulated Injunction, which was negotiated by the Plaintiff States in conjunction with the

Federal Trade Commission, requires timely listing of patents in the Orange Book and prohibits

Defendants from submitting false or misleading Orange Book listing information to the FDA.

The parties acknowledge in the Settlement Agreement that the Order and Stipulated Injunction

provides full, adequate and complete injunctive relief sufficient to address the Released Claims;

and that the Defendants' entry into the Order and Stipulated Injunction is for settlement purposes

only and does not constitute an admission by the Defendants or a determination by the Court or

any other person or entity that the law has been violated. The Order and Stipulated Injunction is

attached as Exhibit 2 to the Motion for Final Approval.

### C.    Release of Claims

If the Settlement Agreement is finally approved by the Court and becomes Effective,

members of the Settlement Class who have not made valid and timely elections to exclude

themselves from the Settlement Class, as well as, to the fullest extent permitted by law, their

respective past, present and future directors, officers, employees, members, shareholders,

attorneys, heirs, executors, administrators, general or limited partners, affiliates, divisions,

agents, representatives, predecessors, parents, subsidiaries, agencies, departments, institutions,

successors and assigns ("**Releasors**"), will unconditionally, fully and finally release and

discharge forever the Defendants and their respective past, present and future directors, officers,

employees, shareholders, affiliates, divisions, agents, representatives, attorneys, heirs, executors,

administrators, predecessors, parents, subsidiaries, general or limited partners, successors, and

assigns ("**Releasees**") of all claims, debts, obligations, damages, liabilities, actions, proceedings,

assertions, and causes of action ("**Claims**"), which any Releasor had, has, or may in the future

have against any Releasee that were or could have been asserted by any Releasor arising out of

or concerning the allegations, or the facts and circumstances giving rise to the allegations, in the Complaints or in any other complaint filed in any action that has been consolidated or coordinated with any of the Complaints, including but not limited to Claims arising under federal or state antitrust, unfair competition, or consumer protection laws, under state or federal deceptive practices acts, or under common law, whether known or unknown, whether accrued in whole or in part of any kind whatsoever, from the beginning of time through January 25, 2005, the date this Court preliminarily approved the Settlement Agreement. Each Releasor will also covenant not to sue any Releasee for such Released Claims. For the avoidance of doubt, the Parties have acknowledged that Released Claims shall not be construed to address in any way (1) any Claim arising solely from and asserting damages based solely on an alleged physical injury, or (2) Claims asserted by any Plaintiff State that do not arise from the facts, matters, transactions, events, occurrences, acts, disclosures, statements, omissions, or failures to act set forth in the Complaints or in any other complaint filed in any action that has been consolidated or coordinated with any of the Complaints, such as Claims relating to "best price" or "average wholesale price" reporting practices or to Medicaid fraud or abuse.

If the Settlement Agreement is finally approved by the Court and becomes Effective, each member of the Settlement Class that has not made a valid and timely election to exclude itself from the Settlement Class, and all other Releasors, shall also be deemed to have expressly waived, released and forever discharged any and all provisions, rights and benefits that may be available under Section 1542 of the California Civil Code ("Section 1542")[4] or any law of any state or territory of the United States, or principle of common law, which is similar, comparable

---

[4] Section 1542 provides: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor." Cal. Civ. Code § 1542 (West 2005).

or equivalent to Section 1542 (each a "Comparable Law").

Members of the Settlement Class have been advised of the statutory language of Section 1542 and the possible availability of Comparable Laws in the Notice of Settlement and, with this understanding, nevertheless have elected to and shall assume all risks for Claims heretofore and hereafter arising, whether known or unknown, suspected or unsuspected, contingent or noncontingent; shall release and forever discharge such Claims as part of the Released Claims; and shall specifically waive any rights they may have under Section 1542 and any Comparable Law. Members of the Settlement Class have been fully advised that if the facts, with respect to which the releases of the Released Claims are given and on which the dismissal with prejudice contained in the Final Judgment and Order is based, are found hereafter to be other than, or different from, the facts now believed by them to be true, they shall expressly accept and assume the risk of such possible differences and facts, shall expressly waive and fully, finally and forever settle, release and discharge any such Claims as Released Claims under this Settlement Agreement, and shall agree that the releases set forth in this Settlement Agreement shall be and remain effective notwithstanding such differences in facts.

If the Settlement Agreement is finally approved by the Court and becomes Effective, each member of the Settlement Class that has not made a valid and timely election to exclude itself from the Settlement Class shall look solely to the Settlement Fund for settlement and satisfaction of all claims that are released under the Settlement Agreement.

## IV.    THE NOTICE OF SETTLEMENT WAS THE BEST PRACTICABLE UNDER THE CIRCUMSTANCES

The Notice Plan (appended as Exhibit 1 to the Affidavit of Thomas K. Glenn, Exhibit B hereto, and approved by the Court on January 25, 2005) has been carried out. It was developed by Mile Marker Zero, LLC for Complete Claims Solutions ("CCS"), which has been appointed

by the Court as the Settlement Administrator. Mile Marker Zero, LLC is a full-service marketing and advertising consulting firm that provides marketing research and analysis services, creative development, advertising and marketing planning, and CCS specializes in class and consumer claims processing and administration. Glenn Aff., Exhibit B hereto, ¶¶ 2, 7.

The Settlement Class members are entitled to notice of the proposed settlement and an opportunity to be heard. *See* Fed. R. Civ. P. 23(e); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). The mechanics of the notice process "are left to the discretion of the court subject only to the broad 'reasonableness' standards imposed by due process." *Grunin v. Int'l. House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975). The Notice Plan here fully comports with the requirements of Rule 23(e) as well as due process requirements.

### A.   Description of Notice Plan and Claims Procedure

The Notice Period began on March 14, 2005, and continued for forty-five (45) calendar days until April 27, 2005. Under the Settlement Agreement and Preliminary Approval Order, Settlement Class members had that Notice Period of 45 days to submit any requests to opt-out of the class and until May 28, 2005 to submit any objections in the manner and following the procedures specified in the Settlement Notice and in the Preliminary Approval Order.

### (1)   Notice Plan

The Notice Plan fully apprised Settlement Class members of the existence of the lawsuit, the proposed Settlement, and the information they needed to make informed decisions about their participation in the case. The Notice Plan consisted of multiple components designed to reach consumers through paid print and broadcast media through Public Service Announcements, earned media, and direct mailed notice (to the extent that information could be obtained) to purchasers of Remeron®. These media were chosen based upon information and

research by Mile Marker Zero, LLC. The media plan provided an estimated reach of more than 90 percent, and frequency realized may have been as much as 2.5 times.[5] This reach of the target audiences and the number of exposure opportunities to the notice information is the best practicable under the circumstances and consistent with standards employed in notification programs designed to reach unidentified members of settlement groups or classes.

### a.  Published Notice

Syndicated data, audited data and proprietary research from the National Mental Health Association and the National Foundation for Depressive Illness were reviewed to identify the media vehicles that would most effectively deliver the message to potential class members in the U.S. and its territories (specifically, Guam, U.S. Virgin Islands and Puerto Rico). Based on this research, a Summary Notice was formulated. The plan was a combination of national Sunday Supplements, *USA Today*, and *Reader's Digest* to reach consumers plus an insertion in *National Underwriter* to reach Third-Party Payors. The Notice Plan's consumer published media schedule was based upon tools and techniques specifically designed for legal notification media planning, accepted advertising industry media audience analysis, as well as 20+ years of consumer print, newspaper, television and trade publication advertising experience. Therefore, the audience delivery of this consumer published media plan was developed using industry standard computer software along with the judgment of 20 years' experience in the development of consumer media plans. The Summary Notice is attached to the Glenn Affidavit, Exhibit B hereto, at Exhibit 4.

---

[5] Measurement of the notice program is provided in terms of *reach* and *frequency*. *Reach* is the estimated percentage of a target audience reached through a specific media vehicle or combination of media vehicles. *Frequency* is the estimated average number of times an audience is exposed to advertising vehicles carrying the message.

Third-Party Payors were reached through the *National Underwriter* trade publication. This publication provides the most targeted access to managers and executives in the insurance industry. *National Underwriter* is the leading news weekly in the insurance industry and its circulation reaches readers across the U.S. and its territories.

The long-form Notice of Settlement provides even more detailed information about the proposed settlement, including a comprehensive summary of the monetary and injunctive terms, a summary of the requested attorneys' fees, litigation costs and incentive awards, and detailed information on the terms of the releases. See Glenn Aff., Exhibit B hereto, at Exhibits 2-3. In addition, the long-form Notice provides information about the fairness hearing date, and Settlement Class members' rights to object or opt out (and deadlines and procedures therefor). Id.

Finally, the long-form Notice included a Claim Form, which could be easily completed and returned by Class members. The Claim Form also is available on a dedicated website, www.RemeronSettlement.com, or by calling a toll-free 800 telephone number provided in the long-form Notice and the Summary Notice.

<b>b.      Mailed Notice</b>

Direct mail notices consisted of mailing the Settlement Notice Packet (including the long-form Notice and a Claim Form) to inform potential class members of their rights and how they could participate in the class action. This direct mail Settlement Notice Packet was sent to all potential Third-Party Payor (TPP) class members included in CCS' proprietary TPP Mailing Database, which includes 13,431 TPPs (e.g., insurance companies, healthcare and welfare funds, self-insureds, etc.) and recordkeepers (e.g,. third-party administrators and pharmacy benefit managers). See Glenn Aff., Exhibit B hereto, ¶¶ 4-6.

22

In addition, potential consumer class members were contacted by direct mail with the assistance of pharmacies and psychiatrists. Many potential class members were mailed a Settlement Notice Packet by their pharmacy and/or psychiatrist. Twenty-six large national pharmacies participated in mailing Settlement Notice Packets and summary payment information to their customers who purchased Remeron® and mirtazapine during the claim period, including 14 of the top 25 drug chains, 6 of the top 7 mass merchant pharmacies, and 3 of the top 6 supermarket pharmacies. Glenn Aff., Exhibit B hereto, ¶ 9. In all, 849,761 Settlement Notice Packets were mailed to potential class members through this program. Id. In addition, two other top drug chains e-mailed summary information to their independently owned stores to notify their customers.[6] This direct mail program provided an opportunity to reach those class members who may have missed the Summary Notice in their newspaper's Sunday supplement or *USA Today*.

### c. News Media

CCS has implemented a campaign to expand notice through free or "earned" media which included contacting consumer groups such as AARP, mental health groups such as the National Alliance for the Mentally Ill, National Federation for Depressive Illnesses, National Mental Health Association, National Community Pharmacists Association, to name a few, and issuing a press release over Businesswire. See Glenn Aff., Exhibit B hereto, ¶ 11.

The State Attorneys General have undertaken further efforts to expand notice through the news media. A number of Attorneys General issued press releases about the settlement, notice and claims process, including the toll-free telephone numbers and website address. These press

---

[6] See Glenn Affidavit, Exhibit B hereto, at Exhibit 6, for a list of the participating pharmacies, the number of packets sent, and the national rankings of the pharmacies based on total pharmacy sales.

releases were run in newspapers and broadcast on the radio. The press releases and links to the settlement website and settlement documents were posted on many of the Attorneys General's own websites. Many Attorneys General took an additional step to notify consumers by sending letters to psychiatrists and TPPs urging their assistance in notifying patients and insureds who were prescribed Remeron® and mirtazapine during the claim period with summary information about the settlement and claims process. Some states made contact with professional associations for pharmacists and psychiatrists, and advocacy groups, to further enlist their assistance in the effort to notify consumers.

### d.    Toll-Free Telephone Number

Complete Claims Solutions has obtained a toll-free telephone number that allows callers to request the Notice of Settlement and obtain a claim form. It also allows them to find out other information about the settlement. <u>See</u> Glenn Aff., Exhibit B hereto, ¶¶ 15-17. This number was included in the Summary Notice, the Notice of Settlement, and on the website, www.RemeronSettlement.com.

### e.    Internet Website

In addition to the media outlets described above, Complete Claims Solutions developed and maintains a website at www.RemeronSettlement.com, which can be accessed by Settlement Class members. This website includes both forms of the Notice, a question and answer segment, and a Claim Form, which can be completed online. <u>See</u> Glenn Aff., Exhibit B hereto, ¶ 13. Settlement Class members are able to send questions by e-mail as well.

### f.    Results of Notice Efforts

The Notice Plan has been highly successful. As of May 25, 2005, with several weeks still to go before the June 13 claims filing deadline, CCS has received 55,190 consumer claims

and 557 TPP claims. Glenn Aff., Exhibit B hereto, ¶ 20. In addition, over 40,000 visits have

been made to the settlement website, id., ¶ 14, and nearly 30,000 telephone calls have been made

to the toll-free number, id., ¶ 16.

**B.      The Proposed Notice Plan and Claims Procedures Meet the Requirements of Due Process**

By all accounts, the combination of direct mail, publication, news media, and Internet-

based notice has resulted in a very high percentage of actual notice to affected consumers, and

certainly the best practicable under the circumstances. These notices and Notice Plan not only

meet but exceed the mandates of due process.

"In order to satisfy due process, notice to class members must be reasonably calculated

under all the circumstances, to apprise interested parties of the pendency of the action and afford

them an opportunity to present their objections." *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D.

109, 119 (D.N.J. 2002) (internal quotations and citation omitted). In Rule 23(b)(3) actions,

"class members must receive the best notice practicable under the circumstances." *Id.* at 119-20

(quoting Fed. R. Civ. P. 23(c)(2)(B)); *see also Varacallo v. Massachusetts Mut. Life Ins. Co.*,

226 F.R.D. 207, 225 (D.N.J. 2005).

The notice forms are similar to those successfully used in numerous other class

settlements. *See, e.g., In re Toys 'R' Us Antitrust Litig.*, 191 F.R.D. 347 (E.D.N.Y. 2000). The

information presented is clear and comprehensive, and is written in simple terminology. The

notices "fairly, accurately, and neutrally describe the claims and parties in the litigation, the

terms of the proposed settlement and the identity of persons entitled to participate in it," and

apprise affected class members of their options with regard to the proposed settlement, thus

fulfilling due process requirements. *Foe v. Cuomo*, 700 F. Supp. 107, 113 (E.D.N.Y. 1988). *See*

*also Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950); *Weinberger v. Kendrick*, 698 F.2d 61, 70 (2d Cir. 1982).

For those whose names and addresses cannot be determined by reasonable efforts, notice by publication suffices under both Rule 23(c)(2) and under the due process clause. *Carlough v. Amchem Products, Inc.*, 158 F.R.D. 314, 325 (E.D. Pa. 1993) (citing *Mullane v. Cent. Hanover Bank & Trust C*o., 339 U.S. at 317-18. Under the circumstances of this case, where End-Payor Plaintiffs, Plaintiff States and Defendants have limited and/or incomplete access to the names or addresses of End Payors who purchased Remeron® during the Class Period,[7] the law requires only notice by publication coupled with such mailed notice as is reasonably feasible. The Notice Plan here is consistent with notice plans used successfully in numerous other class actions and *parens patriae* settlements. *See, e.g., In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 627 (E.D. Pa. 2004); *Toys 'R' Us,* 191 F.R.D. at 350-51. Therefore, this Court should conclude that the Notice Plan satisfied the requirements of Rule 23.

## V.   THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

### A.   The Settlement is Entitled to a Presumption of Fairness

When considering whether this Settlement satisfies the requirements of Rule 23(e), this Court should begin its analysis with a presumption that it is fair. The Third Circuit affords an initial presumption of fairness for a settlement "if the court finds that: (1) the negotiations

---

[7]The privacy of consumers who purchase prescription medication is protected under the provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Public Law 104-91. 42 U.S.C. §1320d-2. HIPAA protects "protected health information" from disclosure. "Protected health information" means individually identifiable health information that is maintained and/or transmitted in any form or medium. 45 C.F.R. §160.103 (2004). Pharmacists are health care providers covered by the act. Patient authorization is required for disclosure of "protected health information." Improper disclosure may subject the provider to civil and/or criminal penalties. 42 U.S.C. §1320d-5 and 6. Thus, End-Payor Plaintiffs and Plaintiff States were unable to obtain a list of potential class members for a direct mail campaign and instead had to rely on pharmacies and psychiatrists to forward Notices to their customers and patients.

occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 n.18 (3d Cir. 2001). As explained in greater detail below, these criteria are satisfied.

As noted above, End-Payor Plaintiffs conducted an extensive economic and factual investigation. This included review of approximately 800,000 pages of documents and data produced by Defendants and third parties, approximately 50 depositions of current or former employees of the Defendants, and extensive consultation with counsel for the Direct Purchasers, counsel for the Generic Manufacturers, the State Attorneys General, and others.

In addition, End-Payor Plaintiffs engaged and consulted with economic and other experts to develop support for theories of liability and to measure the monetary harm suffered by End Payors of Remeron®. End-Payor Plaintiffs have concluded on the basis of their extensive discovery, and factual and legal investigation, that the proposed Settlement is fair, reasonable and adequate.

Likewise, as noted above, the working group of State Attorneys General conducted an extensive economic and factual investigation relating to the claims, underlying events, and conduct alleged by the End-Payor Plaintiffs and others. Plaintiff States retained and consulted with their own expert economists to assist in evaluating the extent of alleged liability and damages. Plaintiff States made a thorough and well-grounded assessment of Defendants' liability and the extent and range of potential damages prior to settlement of the litigation. Plaintiff States have concluded on the basis of their factual and legal investigation that the proposed Settlement is fair, reasonable and adequate.

Detailed settlement negotiations began in earnest late in 2003, and as shown above,

involved numerous face-to-face meetings and telephone conferences, and the exchange of settlement proposals. Negotiations were lengthy, adversarial, and time-consuming. The settlement was agreed upon only after a number of other proposals were considered, analyzed, and finally rejected.

It is the opinion of counsel that the Settlement is fair, reasonable, and adequate. This Court and others have deferred to the judgment of experienced counsel who have conducted arm's-length negotiations in approving proposed settlements. *See, e g., Stewart v. Rubin*, 948 F. Supp. 1077, 1099 (D.D.C. 1996); *McGuinness v. Parnes*, 1989 WL 29814, at *1 (D.D.C. Mar. 22, 1989). *See also In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 424-25 (S.D. Tex. 1999); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 312-13 (N.D. Ga. 1993); 4 A. CONTE & H. NEWBERG, NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002). As stated in the MANUAL FOR COMPLEX LITIGATION, THIRD, a "presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Id.* at 30.42. The arm's-length nature of the negotiations and the participation of experienced counsel strongly support the conclusion that a presumption of fairness should attach here.

The End-Payor Plaintiffs are represented by counsel experienced in antitrust class actions, who unreservedly recommend this settlement. Plaintiffs' Co-Lead Counsel, Arthur M. Kaplan, is a graduate of the Harvard Law School (J.D., cum laude, 1970), where he served as Articles Editor of the Harvard Civil Rights-Civil Liberties Law Review. Mr. Kaplan has been continuously active in antitrust and other complex litigation since then. Mr. Kaplan was Co-Lead Counsel for plaintiffs in the *In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D.

465 (S.D.N.Y. 1998), in which plaintiffs achieved settlements totaling $1.027 billion.[8] He is an

elected member of the American Law Institute, and has guest lectured on litigation topics at the

University of Pennsylvania Law School, at conferences sponsored by the Philadelphia Bar

Association and the Pennsylvania Bar Institute, and elsewhere.

End-Payor Plaintiffs' Co-Lead Counsel Joseph H. Meltzer likewise is experienced and

recommends this settlement. Mr. Meltzer is an honors graduate of the Temple University School

of Law (J.D., *cum laude*) and has focused his practice exclusively on antitrust and complex class

action litigation, first with Barrack Rodos & Bacine in Philadelphia and presently with Schiffrin

& Barroway, LLP. In addition to prominent roles in prosecuting several major antitrust class

actions to successful conclusions, including *In re Sorbates Direct Purchaser Antitrust Litig.*,

C98-4886 (N.D. Cal. 2001) (settlements exceeding $92 million), Mr. Meltzer was appointed Co-

Lead Counsel in *Ryan-House v. GlaxoSmithKline plc*, C.A. 2:02cv442 (E.D. Va.), a

pharmaceutical antitrust class action brought on behalf of end payors of the prescription

medication Augmentin® which recently settled for $29 million. Mr. Meltzer has also defended

antitrust actions, and has represented manufacturing and distribution companies in defending

---

[8] In *In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. at 474, the court in approving that
settlement stated, "It is difficult to conceive of better representation than the parties to this action
achieved." Likewise, in *In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 WL 22037741, at
*6 (D.D.C. June 16, 2003 ), in which Mr. Kaplan was co-counsel for the class of direct
purchasers, the Court in approving settlement characterized counsel as "among the best and most
experienced antitrust litigators in the country." Similarly in *Sutton v. Medical Service Ass'n of
Pennsylvania*, 1994 WL 246166, at *9 (E.D. Pa. June 8, 1994) ("*Pennsylvania Blue Cross/Blue
Shield*"), an ERISA and fraud class action in which Mr. Kaplan was Plaintiffs' Lead Counsel, the
Court found the "quality" of counsel's work was "extraordinarily good." In *Carlson v. General
Motors Corp.*, C.A. No. 86-2674 (D.S.C.), a successful Magnuson-Moss Act consumer class
action against General Motors, the court stated, "Mr. Kaplan is an experienced and distinguished
practitioner..." (11/25/91 Opinion at 19). Mr. Kaplan, together with co-counsel, represented the
West Publishing Company in two courts as both counterclaim defendant and antitrust plaintiff in
a massive antitrust battle with Lexis, and ultimately achieved a very favorable settlement for
West.

monopolization and vertical price restraint cases instituted under the federal antitrust laws.  Mr.

Meltzer is actively involved in the ABA's Section Committee on Antitrust Law.

End-Payor Plaintiffs' Acting Co-Lead Counsel Jeffrey S. Istvan is a 1992 graduate of the

University of Virginia School of Law, where he was a Hardy Cross Dillard Scholar; and a 1989

*summa cum laude* graduate of the University of Rochester.  He joined Fine, Kaplan and Black,

R.P.C. in 1993, following a federal judicial clerkship, and he has been active in antitrust and

consumer class actions, as well as a wide range of other complex litigation on both the plaintiff's

and defendant's sides, since then.  Mr. Istvan was sole lead counsel in *Parsky v. Wachovia Bank,*

*N.A.*, 2001 WL 535786 (C.C.P. Phila. May 8, 2001), a consumer class action that recently settled

for more than $23 million.  He has played significant roles in many large antitrust class actions,

including *In re Copper Antitrust Litig.*, M.D.L. No. 1303 (7th Cir. 2004) (appeal pending); *In re*

*Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348 (N.D. Ga. 2000) (settlements totaling

$50 million); and *In re Commercial Explosives Antitrust Litig.*, 945 F. Supp. 1489 (D. Utah

1996) (settlements totaling $77 million).  He recommends this settlement.

The State Attorneys General, as counsel for the Plaintiff States, have considerable

expertise in complex antitrust *parens patriae* and class action litigation, and likewise recommend

this settlement.  Indeed, this action is part of a long and successful tradition of multistate

litigation by State Attorneys General.  *See, e.g., California v. ARC America Corp.*, 490 U.S. 93

(1989); *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 906 F.2d

432 (9th Cir. 1990); *In re Panasonic Consumer Elec. Prod. Antitrust Litig.*, 1989 WL 63240

(S.D.N.Y. June 5, 1989); *Colorado v. Airline Tariff Publ'g Co.*, 1995 WL 792070 (D.D.C. May

10, 1995).

State Liaison Counsel Patricia A. Conners, Director of the Antitrust Division of the

Florida Attorney General's Office and past Chair of the National Association of Attorneys

General ("NAAG") Multistate Antitrust Task Force, also recommends this settlement. In her

capacity as Director of the Antitrust Division for the Florida Attorney General's Office, Ms.

Connors has, since 1995, been responsible for implementing and overseeing the Attorney

General's state and federal antitrust enforcement efforts. Prior to this, she was an Assistant

Attorney General in the Antitrust Division, working on such notable cases as *Florida v. Borden,

Inc.*, the 1989 school milk bid-rigging cases that resulted in a $36 million recovery for Florida

school boards and *Florida v. Abbott Laboratories, Inc.*, the first of the so-called Infant Formula

cases, and the *Disposable Contact Lens Litigation*, which settled in 2002 for $80 million. She

has practiced antitrust law exclusively since 1987. In 2002, she was appointed Chair of the

NAAG Multistate Antitrust Task Force, in which capacity she coordinates multi-state antitrust

enforcement efforts and ensures the implementation of NAAG Task Force initiatives and policy.

Prior to becoming Chair of the Antitrust Task Force, Ms. Conners served the Task Force as Vice

Chair from 1999 to 2001 and as the Southeast Regional Vice Chair from 1996 to 1999. She has

participated in numerous seminars on a variety of antitrust topics, including state antitrust

enforcement initiatives and issues. Currently, she is a member of the advisory board of the

American Antitrust Institute and Chair of the Florida Bar's recently established Antitrust

Certification Committee. She received both her undergraduate and J.D. degrees from the

University of Florida. She recommends this settlement.

State Liaison Counsel Kim Van Winkle is an Assistant Attorney General in the Office of

the Attorney General of Texas, where she has practiced antitrust law exclusively since 1998.

Ms. Van Winkle graduated in 1997 with honors from the University of Texas School of Law,

with a joint Master of Public Affairs degree from the Lyndon B. Johnson School of Public Affairs. She has participated in the investigation and litigation of numerous complex, multistate antitrust cases, including *In re Buspirone Antitrust Litigation*, No. 01-CV-11401, MDL 1413 (S.D.N.Y. Mar. 7, 2003) (final approval granted for $100 million settlement of end-payor action alleging monopolization of drug markets through patent abuse). She also recommends this Settlement.

Counsel for Defendants, including Joseph Rebein of Shook, Hardy & Bacon, Dean Ringel of Cahill Gordon & Reindel, and Kevin McKenna of Gibbons, Del Deo, Doran, Griffinger & Vecchione, some of the largest and most successful law firms in the country, have comparable expertise and experience in complex antitrust litigation. All parties are intimately familiar with the documents and evidence presented in this action, and all support the proposed Settlement Agreement.

Courts recognize that the opinion of experienced and informed counsel in favor of settlement should be afforded substantial consideration. *In re Nasdaq,* 187 F.R.D. at 473; *State of New York v. Keds Corp.*, 1994 WL 97201, at *2 (S.D.N.Y. Mar. 21, 1994); *New York v. Reebok Int'l. Ltd.*, 903 F. Supp. 532, 535 (S.D.N.Y. 1995), *appeal dism'd*, 96 F.3d 44 (2d Cir. 1996); *In re Shopping Carts Antitrust Litig.*, 1983 WL 1950, at *5 (S.D.N.Y. Nov. 18, 1983); *see also Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980) ("The fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight").

In addition, courts are entitled to place great weight on the fact that a settlement agreement is negotiated by government attorneys committed to protecting the public interest. *Wellman v. Dickinson*, 497 F. Supp. 824, 830 (S.D.N.Y. 1980). S*ee also New York v. Reebok*

*Int'l Ltd*, 96 F.3d 44, 48 (2d Cir. 1996) (noting Attorneys General in *parens* actions motivated by concern for the public interest); *In re Toys 'R' Us Antitrust Litig*, 191 F.R.D. at 351 ("[t]he participation of the State Attorneys General furnishes extra assurance that consumers' interests are protected").

After lengthy and vigorous negotiations, all parties have agreed to the proposed settlement as a just and appropriate resolution of this litigation. The Settlement Agreement has been reviewed and accepted by the Attorney General of each of the 56 Plaintiff States and territories. Accordingly, a presumption of fairness should attach to this Court's consideration of the instant motion for final settlement approval. *See In re Warfarin Sodium Antitrust Litig*, 391 F.3d 516, 535 (3d Cir. 2004) (approving district court's application of presumption of fairness).

### B.     Standards for Judicial Approval of Settlements

A class action may be settled under Rule 23(e) upon a judicial finding that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)(C). It is well-settled that "compromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank,* 216 U.S. 582, 595 (1910). Indeed, it is the policy of the law generally to encourage settlements. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977).

This principle is firmly established in the Third Circuit, where settlement is especially encouraged in complex class actions. *See, e.g., Doe v. Delie*, 257 F.3d 309, 322 (3d Cir. 2000) ("The law favors settlement, particularly in class actions and other complex cases."); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig*, 55 F.3d 768, 784 (3d Cir. 1995) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation."); *In re School Asbestos Litig*, 921 F.2d 1330, 1333 (3d Cir 1990) (Third Circuit policy to encourage settlement

of litigation "that otherwise could linger for years"); *In re Warfarin Sodium Antitrust Litig.*, 212

F.R.D. 231, 254 (D. Del. 2002) (Robinson, C.J.), *aff'd*, 391 F.3d 516 (3d Cir. 2004).

Under Rule 23(e) of the Federal Rules of Civil Procedure, this Court must determine

whether the settlement is within a range that responsible and experienced attorneys could accept

considering all relevant risks and factors of litigation. *See Walsh v. Great Atlantic and Pacific

Tea Co.*, 96 F.R.D. 632, 642 (D.N.J. 1983). The range "recognizes the uncertainties of law and

fact in any particular case and the concomitant risks and costs necessarily inherent in taking any

litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). Hence, the courts

have taken a liberal approach toward approval of class action settlements, recognizing that the

settlement process involves the exercise of judgment and that the concept of "reasonableness"

can encompass a broad range of results.

Because a settlement represents an exercise of judgment by the negotiating parties, cases

have consistently held that the function of a court reviewing a settlement is neither to rewrite the

settlement agreement reached by the parties nor to try the case by resolving issues left

unresolved by the settlement. *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir.

1974); *Bullock v. Administrator of Kircher's Estate*, 84 F.R.D. 1, 4 (D.N.J. 1979). "The

temptation to convert a settlement hearing into a full trial on the merits must be resisted." *Bell

Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1315 (3d Cir. 1993).

A settlement represents the result of a process by which opposing parties weigh and

balance the factual and legal issues that neither chooses to risk taking to final resolution. Courts,

therefore, have given considerable weight to the views of experienced counsel as to the merits of

a settlement. *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 491 (E.D. Pa. 2003);

*Daniel B. v. O'Bannon*, 633 F. Supp. 919, 926 (E.D. Pa. 1986); *Fisher Bros. v. Cambridge-Lee*

*Indus., Inc.*, 630 F. Supp. 482, 488-89 (E.D. Pa. 1985). As noted above, this Court should utilize

a presumption of correctness here because the Settlement was reached in arms-length

negotiations between experienced, capable counsel after meaningful discovery. *See Rendler v.*

*Gambone Bros. Dev. Co.*, 1999 WL 252395, at *4 (E.D. Pa. Apr. 27, 1999).

To determine whether the settlement is fair, reasonable and adequate under Rule 23(e),

courts in the Third Circuit apply the nine-factor test enunciated in *Girsh v. Jepson*, 521 F.2d 153,

157 (3d Cir. 1975) and recently reaffirmed in *Warfarin Sodium*, 391 F.3d at 534-35. These

factors are:

> (1)  The complexity, expense, and likely duration of the litigation;
> (2)  the reaction of the class to the settlement;
> (3)  the stage of the proceedings and the amount of discovery completed;
> (4)  the risks of establishing liability;
> (5)  the risks of establishing damages;
> (6)  the risks of maintaining the class action through the trial;
> (7)  the ability of the defendants to withstand a greater judgment;
> (8)  the range of reasonableness of the settlement fund in light of the best possible recovery; and
> (9)  the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* (quoting *Girsh*, 521 F.2d at 156-57). The Third Circuit accords broad discretion to the

district courts in determining whether to approve a proposed class action settlement. *Id.* at 535.

As set forth below, application of each of these factors to the terms of the Settlement Agreement

demonstrates that the proposed settlement is fair, reasonable and adequate, and final approval of

the Settlement is warranted.[9]

---

[9]  The vast majority of the Plaintiff States' Attorneys General are authorized by their state laws to bring and settle actions as *parens patriae* and/or in an equitable capacity on behalf of their citizens. When evaluating settlements in *parens patriae* actions brought by state Attorneys General under either the Clayton Act or comparable state laws, courts have generally utilized the standards used to analyze private class action settlements under Fed. R. Civ. P. 23. *See, e.g., In re Toys 'R' Us Antitrust Litig.*, 191 F.R.D. at 352; *New York v. Reebok Int'l, Ltd.*, 903 F. Supp. at 535; *In re Minolta Camera Prod. Antitrust Litig.*, 668 F. Supp. 456 (D. Md. 1987). It is